271 F.3d 835 (9th Cir. 2001)
 WASHINGTON LEGAL FOUNDATION; ALLEN D. BROWN; DENNIS H. DAUGS; GREG HAYES; L. DIAN MAXWELL, PLAINTIFFS-APPELLANTS
v.
LEGAL FOUNDATION OF WASHINGTON; KEVIN F. KELLY; BARBARA DURHAM, CHIEF JUSTICE; GERRY L. ALEXANDER, JUSTICE; JAMES M. DOLLIVER, JUSTICE; RICHARD P. GUY, JUSTICE; CHARLES WAYNE JOHNSON, JUSTICE; BARBARA A. MADSEN, JUSTICE; CHARLES Z. SMITH, JUSTICE; PHILIP A. TALMADGE, JUSTICE, DEFENDANTS-APPELLEES
 No. 98-35154
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Rehearing En Banc Granted May 9, 2001
Argued and Submitted En Banc June 21, 2001
Filed November 14, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted][Copyrighted Material Omitted]
 James J. Purcell, Esq., Seattle, Washington, for the plaintiffs-appellants; Daniel J. Popeo, Esq., Washington, Dc, for the plaintiffs-appellants; Richard Samp, Esq., Washington, Dc, for the plaintiffs-appellants.
 David J. Burman, Esq., Perkins Coie, LLP, Seattle, Washington, for the defendants-appellees, Legal Foundation of Washington and Kevin F. Kelly; Todd E. Pettys, Esq., Perkins Coie, LLP, Seattle, Washington, for the Defendants-Appellees, Legal Foundation of Washington and Kevin F. Kelly; Maureen A. Hart, Esq., Assistant Attorney General, Olympia, Washington, for the defendants-appellees, Washington State Supreme Court Justices.
 Stephen M. Rummage, Esq., Chicago, Illinois, for the amicus curiae the American Bar Association; Thomas P. Brown, Esq., Heller Ehrman White & Mcauliffe, San Francisco, California, for the amici curiae Alaska Bar Foundation, Arizona Bar Foundation, Oregon Law Foundation; Peter M. Siegel, Esq., Florida Justice Institute, Inc., Miami, Florida, for the amici curiae National Association of Iolta Programs and 64 State Iolta Programs, State Bar Associations and other organizations concerned with the availability of legal aid to the poor; Robert Dean Welden, Esq., Seattle, Washington, for the amicus curiae Washington State Bar Association.
 Appeal from the United States District Court for the Western District of Washington; John C. Coughenour, District Judge Presiding. D.C. No. CV-97-00146-JCC.
 Before: Schroeder, Chief Judge, Pregerson, Kozinski, Trott, Kleinfeld, Tashima, Silverman, Wardlaw, Fisher, Berzon, and Rawlinson, Circuit Judges.
 Wardlaw, Circuit Judge:
 
 
 1
 Four individuals, Allen Brown, Greg Hayes, Dennis Daugs, and Dian Maxwell, and the Washington Legal Foundation (collectively "Appellants") challenge the legality of Washington State's Interest on Lawyers' Trust Account ("IOLTA") program on First and Fifth Amendment grounds. Beginning where the Supreme Court left off in Phillips v. Washington Legal Foundation, 524 U.S. 156, 160 (1998), Appellants contend that the Washington State IOLTA program unconstitutionally takes the interest generated by their monies placed in IOLTA trust accounts and compels speech. We review this case en banc to consider whether there has been an unconstitutional taking, i.e., a taking without just compensation, of property belonging to Appellants. In doing so, we reject the analytical approach that "trifurcates" the Fifth Amendment issues, previously taken of procedural necessity or otherwise by other courts. Believing the better approach to be consideration of the Fifth Amendment question as a whole, we must decide whether the State of Washington, by establishing its IOLTA program and applying it to Limited Practice Officers, took property belonging to any of the five Appellants without providing just compensation therefor. We analyze this issue in accordance with the dictates of Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978), and hold that with respect to the funds deposited into client trust accounts by the Limited Practice Officers in this case, there has been no taking of property without just compensation in violation of the Fifth Amendment. U.S. Const. amend. V. We have jurisdiction pursuant to 28 U.S.C. &#167 1291, and we affirm the district court with respect to Appellants' Fifth Amendment claim. Because the district court did not have the opportunity to consider Appellants' First Amendment claim in light of Phillips, however, we vacate the judgment on that claim and remand for further proceedings.
 
 I. IOLTA
 
 2
 When a lawyer takes the oath of a state bar, he receives the great privilege of admission to the practice of law in that state and pledges to conduct himself in accordance with the code of professional responsibility that accompanies such an honor. Of the many ethical requirements placed upon lawyers, one of the most significant is loyalty to the client. In addition to representing their clients zealously and protecting their legal rights, lawyers must protect the integrity of their clients' property and avoid using their position as the property's temporary guardian to their own benefit. To this end, lawyers have long been required to place their clients' money in bank accounts separate from their own. As early as 1908, professional ethical guidelines required that "money of the client or collected for the client . . . should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him." Canons of Professional Ethics Canon 11 (1908) (amended 1933). Today, almost one hundred years later, lawyers in all fifty states are held to that same high standard of professional conduct. According to the Model Rules of Professional Conduct, "[a] lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person." Model Rules of Prof'l Conduct R. 1.15(a) (1999).
 
 
 3
 In compliance with these ethical obligations, before 1980, clients' funds were generally pooled in noninterest-bearing, federally insured checking accounts. Phillips , 524 U.S. at 160. Even though, at that time, federal law prohibited federally insured banks from paying interest on checking accounts, such accounts were used to ensure that the funds were available on demand. See 12 U.S.C. &#167 &#167 371a, 146(b)(1)(B), 1828(g). The holding bank received a great windfall from these accounts. Not only did the holding banks use the funds as an interest-free loan, keeping all the derived income, but they also charged the account holder-the lawyer-a fee for services rendered. Only if a sum was very large or was to be held for a long period of time would it be placed in an interest-bearing savings account, because, at that point, the loss of the checking account convenience was outweighed by the value of the interest gained. See Phillips , 524 U.S. at 160-61; see also ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 348 (1982). When such an account was set up, the client bore the additional costs for any services rendered by the bank and the lawyer in accounting for the interest, remitting it to the client, and generating tax forms for both the client and the Internal Revenue Service.
 
 
 4
 Client trust accounts, however, would not remain interest-free for long. In 1980, Congress passed the Consumer Checking Account Equity Act, codified at 12 U.S.C. &#167 1832, which allowed federally insured banks to pay interest on certain demand accounts, called "Negotiable Order of Withdrawal" ("NOW") accounts. NOW accounts are strictly regulated; they must "consist solely of funds in which the entire beneficial interest is held by one or more individuals or by an organization which is operated primarily for religious, philanthropic, charitable, educational, political, or other similar purposes and which is not operated for profit. " Phillips, 524 U.S. at 161 (quoting 12 U.S.C. &#167 1832(a)(2)). Although for-profit organizations, such as corporations, partnerships, associations, and insurance companies, are precluded from establishing NOW accounts for their own benefit, the Federal Reserve Board has determined that they may do so if the funds "are held in trust pursuant to a program under which charitable organizations have `the exclusive right to the interest.' " Id. at 161 (citation omitted).
 
 
 5
 Congress could not have better timed its authorization of interest-bearing NOW accounts. Not only had interest rates reached unprecedented levels in the 1970s, but the States were in need of a new source of legal aid funding. An ethical tradition of the legal profession is the provision of legal services to those who cannot afford to pay for them. See Model Rules of Prof'l Conduct R. 6.1 (Legal Background); Geoffrey C. Hazard, Jr., After Professional Virtue, 6 Sup. Ct. Rev. 213, 215 (1989) ("[A] lawyer's obligation to represent the poor . . . is a classic canon of the legal profession."). Providing legal services to the poor is a complex undertaking, but at a minimum, all attorneys bear the ethical responsibility at some point in their career to represent indigent clients or in some manner work to make the legal system accessible to those who could not otherwise afford it. To that end, bar associations recommend that their members designate a certain number of hours each year to pro bono services. See Model Rules of Professional Conduct Rule 6.1 (recommending at least fifty hours of pro bono work a year). They also help secure funding to support individuals and organizations that provide indigent legal services. From 1974 to 1981, a large percentage of this funding came from the Legal Services Corporation, a federally funded corporation, which awarded direct grants to local attorneys providing legal services to the poor. See James D. Anderson, The Future of IOLTA: Solutions to Fifth Amendment Takings Challenges Against IOLTA Programs, 1999 U. Ill. L. Rev. 717, 720. In 1981, however, Congress severely limited the scope and budget of the Legal Services Corporation, and as a result, the States and their bar associations were forced to look for new sources of funding.
 
 
 6
 The availability of interest through the establishment of NOW accounts provided a unique opportunity for the legal profession to further two of its most important ethical obligations-ensuring that all individuals, regardless of their financial circumstances, have access to the judicial system and segregating client trust funds from the lawyers' own accounts-without imposing additional societal costs. By pooling client deposits that individually were so small or held for such a short period of time that they would not earn a net positive interest, the States could use the interest earned on the combined deposits -otherwise enjoyed as a windfall by the banks-to fund indigent legal services at no cost to the owner of the principal. Thus, in 1981, Florida created the first IOLTA program. Today, every state in the nation has followed suit. See Phillips, 524 U.S. at 159 n.1; see also Ind. Prof. Conduct R. 1.15(d) (2000) (Indiana, the last state to do so, instituted an IOLTA program after Phillips was decided.). IOLTA programs have been a brilliant success: in 1999, they generated $139 million nationwide. See Caitlin Liu, Court Ruling Threatens A Major Funding Source for Legal Aid, L.A. Times, Jan. 22, 2001 at B3.
 
 
 7
 The Washington State Supreme Court created its IOLTA program in 1984, codifying it in the Washington Rules of Professional Conduct as Rule 1.14. This rule requires lawyers to place "client funds that are nominal in amount or expected to be held for a short period of time" in either (i) a pooled interest-bearing trust account, the interest from which is paid to the Washington Legal Foundation, (ii) a separate interestbearing trust account for a particular client, or (iii) a "pooled interest-bearing trust account with subaccounting that will provide for computation of interest earned by each client's funds and the payment thereof to the client." Wash. Rules of Prof'l Conduct R. 1.14(c)(2). When deciding the type of account to establish, lawyers need not inform their clients or obtain their clients' consent. Instead, lawyers are instructed to consider "only whether the funds to be invested could be utilized to provide a positive net return to the client," taking into account "(i) the amount of interest that the funds would earn during the period they are expected to be deposited; (ii) the cost of establishing and administering the account, including the cost of the lawyer's service and the cost of preparing any tax reports required for interest accruing to a client's benefit; and (iii) the capability of financial institutions to calculate and pay interest to individual clients." Wash. Rules of Prof'l Conduct R. 1.14(c)(3).
 
 
 8
 As the IOLTA program was being created, the Washington Supreme Court also ordered the incorporation of the Legal Foundation of Washington, a nonprofit charitable organization dedicated to improving the availability and quality of legal representation for the poor. The Legal Foundation of Washington itself does not litigate or educate but accomplishes its mission by distributing funding to different nonprofit and educational associations through a grant application process. In 1990, the IOLTA program provided $3.9 million to the Legal Foundation of Washington, and in 1995, it provided $2.7 million.
 
 
 9
 This appeal challenges one specific aspect of Washington States's IOLTA program: its application to individuals who, during real estate transactions, place money in the hands of an escrow or title company that employs at least one Limited Practice Officer ("LPO"), a state-licensed non-lawyer who is permitted by the state to "select, prepare, and complete the appropriate legal documents incident to the closing of real estate and personal property transactions . . . . " Wash. Admission to Practice R. 12. The position of "LPO" was created in 1983 in response to a Washington Supreme Court decision holding that laypersons performing those tasks were engaged in the unauthorized practice of law. See Bennion, Van Camp, Hagan & Ruhl v. Kassler Escrow, Inc. 635 P.2d 730 (Wash. 1981). Although IOLTA has applied to lawyers since its inception, it did not apply to LPOs until 1995 when the addition of subsection "h" to Admission to Practice Rule 12 and the enactment of Admission to Practice Rule 12.1 (collectively the "IOLTA rules") imposed on LPOs the same requirements that apply to practicing lawyers. Under Rule 12.1, client funds must be placed in an IOLTA account unless (i) the parties to a real estate transaction enter a written agreement requesting an interest-bearing account and"specifying the manner of distribution of accumulated interest to the parties to the transaction;" (ii) the funds are deposited in "a separate interest-bearing trust account for a particular party to a real or personal property closing on which accumulated interest will be paid to that party;" or (iii) the funds are deposited in "a pooled interest-bearing trust account with subaccounting that will provide for computation of interest earned by each party's funds and the payment thereof to the respective party." Wash. Admission to Practice R. 12.1(c)(2).
 
 
 10
 Although escrow and title companies, like attorneys, use separate client trust funds to hold their clients' deposits, for the purpose of this decision, the similarity stops there. Unlike attorneys, escrow and title companies have never taken advantage of the interest-bearing capabilities of NOW accounts, even though they both used non-interest bearing checking accounts before NOW accounts were established. Escrow and title companies have not deemed NOW accounts to be realistic options for their client trust funds due to the difficulty and expense attendant to the crediting of the proper amount of interest to each person whose funds have passed through the escrow account. Furthermore, these companies handle transactions on behalf of for-profit corporations for which client funds cannot be legally deposited in NOW accounts. Thus, even if the IOLTA rules did not exist and the principal would generate net interest, escrow and title companies would not establish interest-bearing NOW accounts.
 
 
 11
 Before the enactment of the IOLTA rules, escrow and title company client trust funds did not earn interest. They did, however, receive benefits from the holding banks in the form of "earnings credits." The credits, which accrued to the company itself, were used to offset bank fees for a variety of services, including accounting services and wire transfers. With the enactment of Rule 12.1, however, many banks -but not all -have stopped offering earnings credits to escrow and title companies opening IOLTA accounts. To make up for the loss of earnings credits and the corresponding rise in bank fees, some escrow companies -but not all -now charge "IOLTA" fees. As an example of these charges, Appellants provide a sample "settlement statement," which includes an "IOLTA/Accounting fee" of $5.39 charged to both the buyer and the seller.
 
 II. Procedural History
 
 12
 In reaction to the proliferation of IOLTA programs, the Washington Legal Foundation sought individuals who were affected by these programs and, joining them as co-plaintiffs, initiated a number of lawsuits raising a constitutional takings challenge to their validity. It is a matter of public record that to date, the Washington Legal Foundation has filed suit challenging state IOLTA programs in California, Massachusetts, Texas, and Washington. The first of these cases to reach the Supreme Court was Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998). Phillips, however, arrived in a procedurally awkward manner as the Fifth Circuit Court of Appeals had addressed only the question of whether there existed a property right in the interest accruing to client funds deposited in IOLTA accounts. Wash. Legal Found. v. Texas Equal Access to Justice Found., 94 F.3d 996, 1004 (5th Cir. 1996). The Supreme Court similarly limited its review, granting certiorari to determine whether "interest earned on client trust funds held by lawyers in IOLTA accounts [is] a property interest of the client or lawyer . . . ." Phillips v. Wash. Legal Found., 521 U.S. 1117 (1997) (granting certiorari). Thus, the Supreme Court considered only that question. It held"that the interest income generated by funds held in IOLTA accounts is the `private property' of the owner of the principal." Phillips, 524 U.S. at 172 ("We express no view as to whether these funds have been `taken' by the State; nor do we express an opinion as to the amount of `just compensation.' "). The Court left open the question of whether a taking occurred without just compensation by virtue of the IOLTA program. This "bifurcation" of the Fifth Amendment question was presciently criticized by the dissenting Justices as"skew[ing] the resolution of the taking and compensation issues that will follow." Id. at 178 (Souter, J., dissenting).
 
 
 13
 While Phillips progressed through the hierarchy of the federal courts, the Washington Legal Foundation's remaining IOLTA challenges were also making their way through the federal system. In the case before us, the Foundation joined with four individuals-two LPOs and two LPO clients-to challenge Washington State's IOLTA program, naming the Legal Foundation of Washington, its president, and the Justices of the Washington Supreme Court (collectively "Appellees") as defendants. Appellants alleged that Washington's IOLTA program violated their First and Fifth Amendment rights. They sought (i) a judgment requiring the Legal Foundation of Washington "to refund the full amount of interest earned on Plaintiffs Brown's and Hayes's money placed into IOLTA accounts, plus interest;" (ii) a declaratory judgment that Admission to Practice Rules 12(h) and 12.1 are unconstitutional under the First and Fifth Amendments, "insofar as they require LPOs to place certain client funds into IOLTA trust accounts;" (iii) a permanent injunction preventing the Justices of the Washington Supreme Court "from taking any disciplinary action against LPOs who fail to comply with the requirements of . . . Rules 12(h) and 12.1, and from adopting any rules that purport to require LPOs, as a condition for practicing their profession in Washington, to handle client trust funds in a manner designed to ensure that interest on those funds will accrue to anyone not designated by the client;" and (iv) an award of costs and attorney's fees.
 
 
 14
 The district court, without the benefit of the Phillips decision, granted summary judgment to the Legal Foundation of Washington and the Justices on the ground that Appellants did not have a property right to the interest generated on funds held in IOLTA accounts. Without a property right, the district court reasoned, there could be neither a Fifth nor a First Amendment violation. While the case made its way on appeal to us, however, the Supreme Court held in Phillips that those individuals, like Appellants Brown and Hayes, who owned the principal placed in IOLTA accounts also owned the interest. A panel of this court was then faced with the task of advancing to the next stage of the Takings Clause analysis: determining whether there was a taking without just compensation. Following the Supreme Court's lead in dividing the takings analysis into discrete pieces, the now withdrawn panel decision "trifurcated" the takings question into two further issues: whether there was a taking and what compensation was due. Viewing the interest earned on IOLTA funds as an independent entity, separate and distinct from the principal that gave it life, the panel concluded that the IOLTA program resulted in an appropriation of 100% of Appellants' property. Wash. Legal Found. v. Legal Found. of Wash., 236 F.3d 1097, 1100-01 (9th Cir. 2001), withdrawn, 248 F.3d 1201 (2001). Overlooking the Supreme Court's traditional view that due to its fungible nature, money -as opposed to real or personal property -cannot be physically appropriated, see United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989), the panel applied the per se takings test announced in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 441 (1982) (holding that a permanent physical occupation of a portion of a roof was a "taking" regardless of the size of the occupation or the economic impact on the owner because it was a physical appropriation). The panel reversed the district court, holding not only that Appellants owned the IOLTA interest under Phillips, but also that the IOLTA program effected a per se taking that required remand to the district court to determine what "just compensation" was due. Wash. Legal Found. v. Legal Found. of Wash., 236 F.3d at 1097. A majority of the active judges of this court voted in favor of rehearing en banc. We consider the issue anew.
 
 III. Standing
 
 15
 Resolving a Fifth Amendment takings claim requires a fact specific inquiry into what has been taken and what compensation is due. Preliminarily, then, we must determine what property each Appellant has at stake in these proceedings. Because a property right is a prerequisite for advancing to the second stage of the Takings Clause analysis, we cannot allow all five Appellants to proceed simply because one or two have a valid claim to the interest at issue. Mindful that this is not a class action, we must carefully scrutinize each Appellant's interest in and connection to Washington State's IOLTA program. Upon doing so, we find that two of the four individual plaintiffs lack standing to pursue this action. We conclude that only Appellants Brown and Hayes own funds that contribute to the principal placed in an IOLTA account, and that therefore, only they have a property right to the generated interest. Thus, the district court properly dismissed Daug's and Maxwell's claims (albeit, on other grounds). We also hold that the Washington Legal Foundation lacks representational standing to pursue this action.
 
 A. Individual Standing
 
 16
 "[B]efore reaching a decision on the merits, we [are required to] address the standing issue to determine if we have jurisdiction." Nat'l Wildlife Fed'n v. Adams , 629 F.2d 587, 593 n.11 (9th Cir. 1980). "[T]he standing question is whether the plaintiff has `alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." Warth v. Seldin, 422 U.S. 490, 498-99 (1975) (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). There are three requirements for standing: (1) "a plaintiff must have suffered an `injury in fact' -an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not `conjectural' or `hypothetical;' " (2) "there must be a causal connection between the injury and the conduct complained of -the injury has to be `fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result[of] the independent action of some third party not before the court;' " and (3) "it must be `likely' as opposed to merely `speculative,' that the injury will be `redressed by a favorable decision.' " Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) (citations omitted) (alterations in original). We examine the property interest alleged by each of the individual Appellants in turn.
 
 1. Appellant Brown
 
 17
 Appellant Allen Brown regularly purchases and sells real estate in the State of Washington. He knows of one transaction in which his escrow money was placed in an IOLTA account maintained at the Skagit State Bank. According to Brown, the $90,521.29 that he deposited with Land Title Company was placed in an IOLTA account for two days in April of 1997. He "object[s] to anyone other than me taking the interest earned on my funds." He also "object[s] to some of the activities engaged in by LFW and by those to whom LFW distributes IOLTA funds." Because Brown owned the principal that was placed in an IOLTA account, we conclude that the "interest income" earned on that principal is his property and therefore he has standing to challenge the IOLTA program. See Phillips, 524 U.S. at 172.
 
 2. Appellant Hayes
 
 18
 Appellant Greg Hayes has purchased real estate in the State of Washington as part of his business dealings and expects to continue to do so. He and his business partner gave $1000 earnest money to Fidelity National Title Company on August 14, 1996, and the remainder of the property's cost, $6,396.66, on August 28, 1996. Fidelity deposited both sums in an IOLTA account. The real estate transaction closed on August 30, 1996. Hayes was not informed that his escrow funds were being placed in an IOLTA account, and he did not learn of the existence of IOLTA until after that transaction was completed. Like Brown, Hayes "object[s] to anyone other than me taking the interest earned on my funds" and"to some of the activities engaged in by LFW and by those to whom LFW distributes IOLTA funds." Also like Brown, Hayes owned the principal that was placed in an IOLTA account. Thus, we conclude that the "interest income" earned on that principal is his property. Hayes therefore has standing to pursue this action. See Phillips, 524 U.S. at 172.
 
 3. Appellant Daugs
 
 19
 Appellant Dennis Daugs is vice-president of SeaTac Escrow, Inc. ("SeaTac"), which provides escrow services to buyers and sellers in connection with real estate transactions. Daugs is also a licensed LPO, but he refuses to comply with Rule 12.1 because he "ha[s] determined that doing so would violate SeaTac's Fifth Amendment rights (as the holder of legal title to funds in the escrow account) and those of [his] customers (who hold equitable title to the funds). " Under Washington law, however, "legal title" does not include any valuable beneficial interests. See, e.g., Lee v. Wrixon, 79 P. 489, 490 (Wash. 1905) ("[T]he bare legal title, . . . uncoupled with a beneficial interest, is not subject to execution."). Thus, assuming, without deciding, that Daugs holds "legal title" to the principal placed in the escrow account, that alone does not confer on him a right of ownership. Although Daugs may have legitimate objections to the IOLTA program and may believe his clients are better served by disregarding its dictates, he does not own the principal that is deposited in the IOLTA accounts, and therefore, he has no claim to the generated interest. Without the requisite property right, Daugs lacks standing to challenge the IOLTA program on Fifth Amendment grounds. We thus affirm the district court's judgment as to Appellant Daugs.
 
 4. Appellant Maxwell
 
 20
 Appellant Dian Maxwell is employed by Pacific Northwest Title Company of Washington ("PNW"), which provides escrow services among other things. After Rule 12.1 was established, PNW decided that to avoid the additional costs of the IOLTA program, estimated to be about $50.00 per transaction, it would not comply with Rule 12.1. Thus, PNW required its LPOs -including Maxwell-to surrender their licenses if they wished to continue employment. According to Maxwell, relinquishing her LPO license prevents her from fully practicing her profession because she can no longer "select and fill in the legal documents that [she is ] fully qualified to select and fill in." Unlike Daugs, who asserts in his declaration that he-as the owner of SeaTac-held legal title to the principal placed in IOLTA accounts, Maxwell does not claim any ownership in the principal or the generated interest. At most, Maxwell appears to be arguing that she lost property in the form of her LPO license as a result of the IOLTA rules.
 
 
 21
 Although Maxwell may have been adversely affected by application of the IOLTA rules to LPOs, the loss of her LPO license was an indirect result of PNW's independent decision to eliminate LPOs from its payroll. Even if LPOs were exempt from the IOLTA rules, Maxwell can only speculate as to whether PNW would allow her to obtain a new LPO license while under its employment. Maxwell has failed to establish that her injury-the loss of her LPO license--would be redressed if LPOs were no longer required to place client funds in IOLTA accounts because such a result would require PNW to make an independent, intervening decision to employ licensed LPOs. See Pritikin v. Dept. of Energy, 254 F.3d 791, 797 (9th Cir. 2001). Thus, not only was she properly denied relief by the district court on the ground that she had no property right to the generated interest, but because she has not shown that eliminating Rule 12.1 will redress her injury, she lacks standing to challenge the IOLTA program on Fifth Amendment grounds. See Lujan, 504 U.S. at 560-61 (1992).
 
 B. Representational Standing
 
 22
 Washington Legal Foundation is a public-interest law and policy center with members nationwide. As evidence of its connection to the Washington IOLTA program, Washington Legal Foundation declares that its membership includes "citizens of Washington who object to having their money used to support the Washington IOLTA program, and LPOs in Washington who object to being forced to place client trust funds in IOLTA accounts." Of the four named Appellants, it appears that only Daugs and Hayes are themselves members.
 
 
 23
 The Supreme Court has established a three-prong test for determining whether an organization, such as the Washington Legal Foundation, can sue in its representative capacity. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977); Presidio Golf Club v. Nat'l Park Serv., 155 F.3d 1153, 1159 (9th Cir. 1998). "[A]n association has standing to bring suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt, 432 U.S. at 343. If "the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind." Id. (quoting Warth, 422 U.S. at 515).
 
 
 24
 With respect to the alleged Fifth Amendment violation, Washington Legal Foundation encounters problems at the third prong of the representational standing inquiry. Because "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation," Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 194 (1985), prospective injunctive relief is an inappropriate remedy here, where the individuals are pursuing their remedy against the state, and the question is whether they are entitled to any remedy for the state regulatory action at issue. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016 (1984) ("Equitable relief is not available to enjoin an alleged taking of private property for public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking."). While equitable relief may be available under other circumstances in a takings case, see, e.g., Duke Power Co. v. Carolina Environmental Study Group. Inc., 438 U.S. 59, 71 n.15 (1978) ("[The Declaratory Judgment Act] allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."); Transohio Sav. Bank v. Director, Office of Thrift Supervision , 967 F.2d 598, 613 (D.C. Cir. 1992) ("the district court should accept jurisdiction over takings claims for injunctive relief in the few cases where a Claims Court remedy is `so inadequate that the plaintiff would not be justly compensated' ") (citation omitted), the remedy for the Fifth Amendment violation alleged here is to provide the property owner with just compensation, if a taking has occurred. Because the appropriate relief--determining what, if any, just compensation is due to the owner of the property taken -necessarily requires the participation of the individual members, Washington Legal Foundation does not have representational standing to pursue a Fifth Amendment taking claim.
 
 
 25
 Thus, we hold that only individual Appellants Brown and Hayes have standing. We affirm the district court's grant of summary judgment to the Legal Foundation of Washington and the Justices of the Washington Supreme Court on the Fifth Amendment claims of Daugs, Maxwell, and the Washington Legal Foundation. We leave open the question of standing as it pertains to the Appellants' First Amendment claims. We proceed with our Takings Clause analysis only as it relates to the property of Appellants Brown and Hayes.
 
 IV. Ripeness
 
 26
 Also as a jurisdictional matter, we must determine whether the Fifth Amendment challenges of Brown and Hayes are ripe for review. The ripeness doctrine is derived from Article III's case or controversy requirement. It "prevents `the courts . . . from entangling themselves in abstract disagreements over administrative policies, and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by challenging parties.' " Stuhlbarg Int'l Sales Co. v. John D. Brush and Co., 240 F.3d 832, 839 (9th Cir. 2001) (quoting Lee Pharm. v. Kreps, 577 F.2d 610, 618 (9th Cir. 1978)) (alterations in original). Although Appellees did not raise the question of ripeness at the district court, we may consider it for the first time on appeal. See Reno v. Catholic Soc. Serv., 509 U.S. 43, 58 n.18 (1993) (concluding that because ripeness is derived in part from Article III principles, it may be raised for first time in the Supreme Court); In re Cool Fuel Inc., 210 F.3d 999, 1006 (9th Cir. 2000) (holding that ripeness claims may be raised for the first time on appeal).
 
 
 27
 Appellees argue that the Fifth Amendment claims of Brown and Hayes are not ripe for review under Williamson County Regional Planning Commission v. Hamilton Bank, 473 U.S. 172 (1985). We disagree.
 
 
 28
 In Williamson, petitioners claimed that the application of particular zoning regulations deprived them of their property without just compensation. Specifically, they alleged that the Williamson regional planning commission unreasonably disapproved of Hamilton Bank's preliminary development plans. Williamson, 473 U.S. at 175. Before the Court could reach the merits, however, it first had to determine whether the Commission had reached a final decision with respect to the development plans. If the Commission's decision was not final, it could not have "taken" the property, and the case would not be ripe for review. Id. at 186. The Court then established a two-prong test for determining whether the takings claim was ripe. First, "the government entity charged with implementing the regulations [must have] reached a final decision regarding the application of the regulations to the property at issue." Id. at 186. Second, compensation must have been sought "through the procedures the State has provided for doing so." Id. at 194. Hamilton Bank had not sought building variances to allow development in accordance with its proposed plans, thereby failing to obtain the required final decision, id. at 190, nor had it sought compensation through the state's inverse condemnation proceedings, thereby precluding a determination that the State's compensation was either just or not, id. at 194. The Court therefore concluded that the claim was not ripe.
 
 
 29
 There are, however, a few limited exceptions to the requirement of seeking compensation from the State before raising a takings claim. Williamson itself held that a plaintiff may be excused from this requirement if he demonstrates that "the inverse condemnation procedure is unavailable or inadequate." Id. at 197. In addition, "[a]n exception exists where the state does not have a `reasonable, certain, and adequate provision for obtaining compensation' at the time of the taking," San Remo Hotel v. City and County of San Francisco, 145 F.3d 1095, 1101-02 (9th Cir. 1998); see also Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 687 (9th Cir. 1993), or where resorting to state remedies would be futile, see City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 710 (1999).
 
 
 30
 With respect to the first requirement, the enactment of Rules 12(h) and 12.1 constitutes a final decision. With respect to the second, we believe that the futility exception applies. The final authority on a Washington State inverse condemnation proceeding is the Washington Supreme Court. The Justices of the Washington Supreme Court, as parties to the present action, have filed briefs that argue, not just that the claim is unripe, but that there was no Fifth Amendment violation. The Justices do not point to an available state remedy, nor do they suggest that one is needed. Thus, we conclude that requiring Brown and Hayes to seek compensation from the State-a decision reviewable by the State Supreme Court-would be futile, and hold that the Fifth Amendment challenges to the IOLTA program raised by Brown and Hayes are ripe for review.
 
 V. The Fifth Amendment
 
 31
 The Fifth Amendment, made applicable to the States through the Fourteenth Amendment, prohibits the taking of "private property . . . for public use, without just compensation." U.S. Const. amend. V. For Brown and Hayes to succeed in their Fifth Amendment challenges, they must establish that the interest at issue was their private property and that it was taken without just compensation. See Del Monte Dunes at Monterey v. City of Monterey, 920 F.2d 1496, 1500 (9th Cir. 1990). An allegation that private property for which no compensation is due has been taken is insufficient to sustain a Fifth Amendment claim because it is the taking without just compensation that is constitutionally prohibited. See Williamson County Reg's Planning Comm'n, 473 U.S. at 194 ("The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."); Macri v. King County, 126 F.3d 1125, 1129 (9th Cir. 1997) ("The Fifth Amendment is not offended by the government taking property, but only by the government taking property without just compensation.").
 
 A. Private Property
 
 32
 Following the Supreme Court's decision in Phillips, there can be no doubt that the interest earned on IOLTA account deposits is the private property of the owners of the principal. Thus, under Phillips, Appellants Brown and Hayes have a property right to whatever interest their individual deposits generate.
 
 
 33
 Appellees nevertheless attempt to distinguish Phillips, urging us to hold that, because property rights are created by state law, Phillips, which assessed property rights under Texas law, does not control the decision under Washington State law. See Phillips, 524 U.S. at 164 (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972)) ("[T]he existence of a property interest is determined by reference to `existing rules or understandings that stem from an independent source such as state law.' "). This attempt is unavailing, however, because whatever distinction there may exist between Texas and Washington property law is not a tenable basis for avoiding the rule of Phillips.
 
 
 34
 In reaching its conclusion that "regardless of whether the owner of the principal has a constitutionally cognizable interest in the anticipated generation of interest by his funds, any interest that does accrue attaches as a property right incident to the ownership of the underlying principal," id. at 168 (emphasis in original), the Phillips majority relied upon "[t]he rule that `interest follows principal' [that] has been established under English common law since at least the mid1700's." Id. at 165 (quoting Beckford v. Tobin, 27 Eng. Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body.")). Because Texas courts had long recognized the application of this common law rule, the Court rejected the argument that certain provisions of Texas law--income-only trusts and marital community property rules--demonstrated its disavowment. Id. at 167-68. Furthermore, allowing Texas to legislatively "sidestep the Takings Clause by disavowing traditional property interests long recognized under state law" would directly contradict the Court's holding in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980), that " `a State, by ipse dixit, may not transform private property into public property without compensation' simply by legislatively abrogating the traditional rule that `earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property.' " Phillips, 524 U.S. at 167 (citation omitted).
 
 
 35
 We applied Webb's and Phillips in Schneider v. California Department of Corrections, 151 F.3d 1194 (9th Cir. 1998), which held, despite a state statute to the contrary, that prisoners possess a constitutionally cognizable property right in the interest earned on the principal held in Inmate Trust Accounts. Schneider, 151 F.3d at 1201. Seeking to square Webb's and Phillips, which held that the common law rule that "interest follows principal" could not be abrogated by state statute, with Roth, which held that property interests were protected by the Constitution but created by state law, we distinguished between "new property" interests and "old property" interests. Id. at 1200-01. Although Roth, "a socalled `new property' case," affirmed the"unremarkable proposition that state law may affirmatively create constitutionally protected `new property' interests," it "in no way implie[d] that a State may by statute or regulation roll back or eliminate traditional `old property' rights." Id. at 1200 (emphasis in original).
 
 
 36
 The States' power vis-a-vis property thus operates as a one-way ratchet of sorts: States may, under certain circumstances, confer "new property" status on interests located outside the core of constitutionally protected property, but they may not encroach upon traditional "old property" interests found within the core.
 
 
 37
 Id. at 1200-01 (emphasis in original). We defined the "core of constitutionally protected property . . . by reference to traditional `background principles' of property law. " Id. Because of the "common law pedigree and near-universal endorsement by American courts[,]" we concluded that the "interest follows principal" rule lay at the core of property law, and therefore could not be abridged by state statute. Id. at 1201 (citation omitted).
 
 
 38
 Although Appellees attempt to demonstrate that under Washington law, Brown and Hayes have no property right in the IOLTA interest, any distinctions that can be drawn between Washington law and Texas law (Phillips ), Florida law (Webb's), or California law (Schneider) are immaterial. This is particularly true given that Washington adopted the common law, as did most other states, by enacting a"reception statute" that provides that "[t]he common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington, nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state." Wash. Rev. Code &#167 4.04.010. Furthermore, Washington state courts have previously applied the common law "interest follows principal" rule. In Tacoma School District. v. Hedges, 42 P. 522, 522 (Wash. 1895), the Washington Supreme Court held that "[i]n the absence of any statute upon the subject," the interest and penalties collected upon delinquent taxes should go to the school districts entitled to the principal rather than a general county fund. In 1988, nearly a century later, a Washington appellate court, "look[ing] to the common law" and relying on the "principle that interest on public funds follows the ownership of those funds," held that "penalty and interest would follow the taxes upon which they were assessed." City of Seattle v. King County, 762 P.2d 1152, 1155 (Wash. Ct. App. 1988).
 
 
 39
 Thus, Appellees' attempts to distinguish Phillips by pointing to differences between Washington and Texas property law fail. The interest earned on the principal owned by Brown and Hayes held in IOLTA accounts is their private property.
 
 B. Unconstitutional Taking
 
 40
 The Phillips majority did not address the question of whether an unconstitutional taking of private property occurred:
 
 
 41
 We express no view as to whether these funds have been "taken" by the State; nor do we express an opinion as to the amount of "just compensation, " if any, due respondents. We leave these issues to be addressed on remand.
 
 
 42
 Phillips, 524 U.S. at 172 (emphasis added). Far from disregarding the Phillips majority, as our dissenting colleagues suggest, we follow its directive in answering these questions on a fully developed record.
 
 1. Whether a Taking has Occurred
 
 43
 Because Phillips did not reach the issue of whether a taking occurs when a state program enables otherwise barren principal to earn a net positive interest for the benefit of the poor, we turn to other takings cases involving property of a similar nature for guidance. As a preliminary matter, we must define the exact nature of the property at issue. In determining the existence of the property right, the Phillips majority stated that the accrued interest "attaches as a property right incident to the ownership of the underlying principal." Phillips, 524 U.S. at 168. Thus, the Court acknowledged that without the principal, there would be no interest and no property right in that interest. Because the latter does not exist without the former, we believe that it is logically sound to analyze the two in combination for purposes of determining whether a taking of property occurred. In a similar analysis of interest accruing on deposited funds, the Court characterized the interest on principal as a "beneficial use of [the owner's] property" or "[a restriction of] the owner's full exploitation of the property," Webb's, 449 U.S. at 163, thus suggesting that it did not view the principal and the interest as separate and distinct property interests. Applying the same reasoning, the property that we examine is a combination of the principal, which Appellants argue they have a right to keep from earning interest accruing to the State, and interest generated thereon, which Appellants argue has been taken from them.
 
 
 44
 a. Per se v. Ad Hoc Analysis
 
 
 45
 We have generally accepted two methods of analysis in takings cases: the per se analysis used in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 441 (1982), and the ad hoc analysis used in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). The per se analysis has not typically been employed outside the context of real property. It is a particularly inapt analysis when the property in question is money. As the Supreme Court has observed, "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property. Unlike real or personal property, money is fungible. " Sperry Corp., 493 U.S. at 62 n.9. The Court reaffirmed this view in Eastern Enterprises v. Apfel, 524 U.S. 498, 530 (1998), when it held that although Eastern was required to pay millions of dollars to its employee benefits funds, it "is not, of course, a permanent physical occupation of Eastern's property of the kind that we have viewed as a per se taking. " Eastern Enters., 524 U.S. at 530. We have endorsed Sperry's conclusion that money differs from physical property in respects significant to takings analysis. Applying Sperry's rationale, we held that an "[o]rdinance [imposing a fee in connection with the issuance of permits for nonresidential development to finance low-income housing] does not, as appellants suggest, constitute a taking per se." Commercial Builders of N. Cal. v. City of Sacramento, 941 F.2d 872, 875 (9th Cir. 1991). Other circuits have similarly approved of this aspect of Sperry. See Meridian Trust and Safe Deposit Co. v. FDIC, 62 F.3d 449, 454 (2d Cir. 1995) (ad hoc analysis employed to determine whether an assessment under the Federal Deposit Insurance Act's cross-guarantee provision that rendered Meridian Trust insolvent constituted a taking); Unity Real Estate Co. v. Hudson, 178 F.3d 649, 674 (3d. Cir.), cert. denied, 528 U.S. 963 (1999) (ad hoc analysis employed to determine whether requiring plaintiffs to pay benefits under the Coal Industry Retiree Health Benefit Act constituted an unconstitutional taking where it would bankrupt the company because "the categorical approach [to Takings Clause claims ] has only been used in real property cases" and states traditionally have a high degree of control over commercial dealings); Branch v. United States, 69 F.3d 1571, 1576 (Fed. Cir. 1995) (ad hoc analysis employed to determine whether an assessment under the Federal Deposit Insurance Act's cross-guarantee provision constituted a taking because "the challenged assessment did not constitute either an invasion or a restriction on the use of real property"); Nixon v. United States, 978 F.2d 1269, 1285 (D.C. Cir. 1992) (characterizing Sperry as "distinguishing between money, which is not subject to the per se doctrine because it is fungible, and `real or personal property' " (citation omitted)).
 
 
 46
 When similarly faced with the question whether a policy that transferred the interest that accrued on interpleader funds deposited in Florida courts to the clerk of the court was an unconstitutional taking in Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 163-64 (1980), the Supreme Court used the ad hoc analysis of Penn Central Transportation Co. v. New York, 438 U.S. 104 (1978), as opposed to Loretto's per se approach. Although in the past it had "been permissive in upholding governmental action that may deny the property owner of some beneficial use of his property or that may restrict the owner's full exploitation of the property, if such public action is justified as promoting the general welfare," the Court concluded that Florida's policy had done more than "adjust [ ] the benefits and burdens of economic life to promote the common good." Webb's Fabulous Pharm., Inc., 449 U.S. at 163 (citation and quotation marks omitted). The Court characterized the Florida policy of retaining the interest from interpleader accounts -the interest at issue exceeded $90,000 -as a "forced contribution to general governmental revenues" for which "[n]o police power justification is offered." Id. The Court compared the county's appropriation of interest to that addressed in United States v. Causby, 328 U.S. 256, 262-63 n.7 (1946), in which the Government had appropriated the air space above claimant's land as part of the flight pattern for military aircraft, destroying its use as a chicken farm. The Supreme Court later categorized Causby as an ad hoc case, when it reviewed the factors that had a particular significance on the "essentially ad hoc , factual inquiries" in the Court's Takings Clause jurisprudence in Penn Central, 438 U.S. at 123-28.
 
 
 47
 Our conclusion that we should take guidance from the Court's analysis in Webb's is bolstered by the Supreme Court's reliance on the Webb's decision in Phillips when it determined that a property right existed in the first place. Both cases applied the same common law rule-"any interest . . . follows the principal"-in concluding that the interest at issue was the property of the owner of the principal. Phillips, 524 U.S. at 166.
 
 
 48
 Moreover, we are presented with the very circumstances for which the Penn Central analysis was intended. Here, the government's "interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." Penn Central, 438 U.S. at 124. In creating its IOLTA program, Washington State concluded that " `the health, safety, morals, or general welfare' would be promoted," see Penn Central, 438 U.S. at 125 (citation omitted), by using the interest generated on IOLTA funds to help fund legal services for the poor. Although the IOLTA program, like most government regulations, "curtails some potential for the use or economic exploitation of private property[,] requir[ing] compensation in all such circumstances would effectively compel the government to regulate by purchase." Andrus v. Allard, 444 U.S. 51, 65 (1979) (emphasis in original) (applying Penn Central's ad hoc analysis to determine if regulations restricting one means of disposing of certain Indian artifacts was an unconstitutional taking). We do not believe that the Fifth Amendment demands such an extreme result. The Takings Clause was never intended to replace the role of the people in determining which social programs are appropriate, and "has not been understood to be a substantive or absolute limit on the government's power to act. That Clause operates as a conditional limitation, permitting the government to do what it wants so long as it pays the charge." Eastern Enters., 524 U.S. at 545 (Kennedy, J., concurring in judgment and dissenting in part).
 
 
 49
 That the banking industry is the regulatory backdrop for our decision also counsels against the application of the per se analysis to the regulations of the use of money at issue. Such analysis has almost exclusively been employed in situations involving real property. In creating its IOLTA program, Washington has not encroached upon a domain devoid of governmental regulation. As the Phillips majority recognized, it is the Federal Government's own regulations that make the state IOLTA programs feasible. Specifically, "the Federal Government imposes tax reporting costs only on those who attempt to exercise control over the interest their funds generate, see Rev. Rul. 81-209, 1981-2 Cum. Bull. 16[and] prohibits for-profit corporations from holding funds in NOW accounts if the interest is paid to the corporation, but permits corporate funds to be held in NOW accounts if the interest is paid to the [IOLTA fund], see Federal Reserve's IOLTA letter." Phillips, 534 U.S. at 170-71. We agree with the reasoning of the Federal Circuit:
 
 
 50
 Because of "the State's traditionally high degree of control of commercial dealings," Lucas, 112 S.Ct. at 2899, the principles of takings law that apply to real property do not apply in the same manner to statutes imposing monetary liability. Thus, even though taxes or special municipal assessments indisputably "take" money from individuals or businesses, assessments of that kind are not treated as per se takings under the Fifth Amendment.
 
 
 51
 Branch, 69 F.3d at 1576 (citations omitted). Given the highly-regulated nature of the banking industry, individuals should expect that their commercial transactions, including their bank deposits, will be regulated. In contrast, "property law has long protected an owner's expectations that he will be relatively undisturbed at least in the possession of his property." Loretto, 458 U.S. at 436. While requiring an apartment owner to allow the "direct physical attachment of plates, boxes, wires, bolts, and screws to the building" is directly contrary to the history and tradition of property law, regulating what a bank depositor may earn on a particular bank deposit is concordant with the history and tradition of banking practice. Id. at 420.
 
 
 52
 Although we note that the Fifth Circuit recently has decided in a two to one decision to adopt the per se method of analysis in similar (but not identical) circumstances, see Washington Legal Foundation v. Texas Equal Access to Justice Foundation, 270 F.3d 180 (5th Cir.2001), given the monetary nature of the property in question, the public nature of the IOLTA program, and the highly-regulated nature of the banking industry, we believe that the better approach is that of Penn Central . Through the IOLTA program, the State of Washington may properly adjust the rights of individuals for the benefit of the public as long as its actions are "reasonably necessary to the effectuation of a substantial public purpose," Penn Central, 438 U.S. at 127, a determination that can be made only by engaging in the fact-specific ad hoc analysis. Following the Supreme Court's lead in Webb's, and the dictates of well-established takings jurisprudence, we not only believe it is entirely appropriate to apply Penn Central's ad hoc takings analysis to the IOLTA program, but that such an analysis is compelled.
 
 
 53
 b. Application of Ad Hoc Analysis
 
 
 54
 In conducting the factual inquiry required by Penn Central's ad hoc analysis, we may conclude a taking has occurred only if a particular regulation goes so far that it "force[s] `some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " Wash. Legal Found. v. Mass. Bar Found., 993 F.2d at 974 (quoting Armstrong v. United States, 364 U.S. 40, 49 (1960)). Although the ad hoc analysis provides no" `set formula' for determining when `justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons," the Supreme Court has principally relied on three factors: (1) "[t]he economic impact of the regulation on the claimant;" (2) "the extent to which the regulation has interfered with distinct investment-backed expectations;" and (3) "the character of the governmental action. " Penn Central, 438 U.S. at 124; Phillips, 524 U.S. at 176 ("Attention should be paid to the nature of the government's action, its economic impact, and the degree of any interference with reasonable investment-backed expectations") (Souter, J., dissenting) (citation omitted). Although we proceed to consider these factors in the context of the LPO-deposited funds here at issue, the Penn Central analysis-as opposed to the per se analysis-applies with the same force of logic to lawyer-deposited client funds.
 
 
 55
 (i) Economic Impact
 
 
 56
 Before Rule 12.1 was enacted, escrow and title companies deposited customer trust funds into non-interest bearing checking accounts despite Congress's authorization of interest-bearing NOW accounts in 1980. Even today, those escrow and title companies that do not employ LPOs generally do not use NOW accounts because of the expense and difficulty involved in crediting the proper amount of interest to each affected person and because many of these clients are for-profit organizations prohibited from using NOW accounts. Thus, because no interest would be earned on client funds deposited by escrow and title companies absent the IOLTA program, requiring those companies to place client trust funds in IOLTA accounts has no economic impact on the owners of the principal. Indeed, if there be any economic impact, it is a positive one. Before their enactment, client trust funds were not placed in interest-bearing trust accounts. Following their enactment, however, client trust funds must be placed in interest-bearing accounts if they are not placed in IOLTA accounts. Thus, the IOLTA program, at worst, maintains the status quo and, at best, provides clients with interest they otherwise would not have earned.
 
 
 57
 Furthermore, the IOLTA regulations themselves provide that only those funds that would not earn a net interest--either on their own or when pooled with subaccounting-are to be deposited in IOLTA accounts. If for some reason, funds are placed in an IOLTA account which, due to miscalculation on the part of the LPO or some unforeseen delay, could have earned a net positive interest, the "taking" of that generated interest would be the direct result of the LPO's violation of the Admission to Practice Rules. Because such a violation cannot be attributable to the State, it cannot implicate the Takings Clause. Although Appellant Hayes believes that his "choice to receive the interest from my withholdings" was taken and Appellant Brown objects to "hav[ing ] no control over where the interest" goes, absent the IOLTA program, neither would have earned a positive net interest to receive or control. Brown concedes this fact. In response to being asked whether he was arguing that without IOLTA he would have earned $4.96, the amount calculated as the interest earned on the deposit at issue, Brown acknowledged that "[w]ithout IOLTA in place I may not have earned anything." Thus, because neither Brown nor Hayes would have earned net interest on their principal deposits, placing their funds in IOLTA accounts had no direct economic impact on them.
 
 
 58
 Nonetheless, Brown and Hayes maintain that they suffered a direct economic impact because, once escrow and title companies employing LPOs were required to place client funds in interest bearing IOLTA accounts, some banks decided to stop offering earnings credits due to the cost of simultaneously paying interest on IOLTA accounts and providing earnings credits. Brown and Hayes claim that, because some escrow and title companies charge IOLTA fees to make up for the lost earnings credits, the cost of their real estate transactions increased. This assertion does not affect our economic impact analysis, for two reasons. First, neither Brown nor Hayes has established either that they were charged an IOLTA fee or that the banks used by their escrow companies have stopped offering earnings credits. Second, the earnings credits were incentive payments to the escrow companies, not their customers, and, as such, the indirect economic impact on the escrow company customers of the companies' loss of credits cannot be considered as part of a takings analysis.
 
 
 59
 To the contrary, Skagit Bank, the bank holding Brown's principal, is among those that continue to give earnings credits for IOLTA accounts. Brown, however, argues that "it's on a really reduced scale since IOLTA came into effect. " Thus, Brown claims that although he would not receive a direct payment of interest without IOLTA, he lost the equivalent, which "would have been earned in the sense of earnings credits" and have kept his costs down. He, however, fails to establish how much the additional costs were or whether they even existed.
 
 
 60
 Hayes's principal was deposited in an IOLTA account, Fidelity National Title Company of Washington ("Fidelity"), held with Seafirst Bank. Although Seafirst stopped offering earnings credits on IOLTA accounts some time after Rule 12.1 was adopted, the record does not allow us to determine whether Fidelity passed the loss of earnings credits onto its customers by imposing an IOLTA fee. Hayes's escrow closing statement does not appear to include an IOLTA fee, and Hayes does not assert that such a fee was charged. As support for his claim, Hayes relies solely on his unsupported belief that "escrow compan[ies] in order to close the property . . . have to increase their fees and I have to pay them an increased fee to cover the cost of IOLTA."
 
 
 61
 The record also fails to establish whether, as a general matter, those escrow companies that deal with banks that have stopped giving earnings credits in fact charge an additional fee to cover the loss. It seems, for example, that Daugs's company does not impose additional costs to make up for the loss of earnings credits. On the other hand, Maxwell testified that Pacific Northwest Title Company charged a flat rate "trust accounting fee" after the enactment of Rule 12.1 during the time that it still employed LPOs. Attached to the declaration of Gerald Wheeler, a C.P.A. who does computerized escrow accounting for banks, is an escrow settlement statement from an unrelated land transaction. Both the buyer and the seller were charged $5.40 as an "IOLTA/Accounting Fee " and a tax on the IOLTA/Accounting Fee. Yet Keith Leffler, an associate professor of Economics at the University of Washington, argues that IOLTA fees are really an example of sellers "testing whether they can profitably raise prices." According to Leffler, "[i]t is very likely that the IOLTA program has had no effect on the prices paid by the users of escrow services." He believes that only an economic analysis could determine whether IOLTA has had an adverse impact on escrow fees, but no such analysis has been done. Furthermore, because those companies that impose IOLTA fees charge both the buyer and seller, Leffler argues that "the amount[bears] no relationship to any change in earnings credits from . . . earnest money deposit[s] . . . . [E]ven if one could show that as a result of [a loss of earning credits] there was an average increase in the prices paid by users of these services, there would be no reason to believe that the impact on any particular client would bear any relationship to any loss of earnings credit on the funds of that client, much less any relationship to the interest paid to the IOLTA program on that client's funds."
 
 
 62
 Moreover, as Professor Leffler's economic analysis demonstrates, even if there were an economic impact on escrow companies' customers such as Brown and Hayes, that impact would have been the result of discrete, discretionary pricing decisions by the affected escrow companies in response to the bank's decision to discontinue or decrease the availability of discounts on the companies' banking charges. While the dissent focuses on the fact that the payment of the earnings credits demonstrates that the deposits had economic value to the bank, one hardly needs that evidence to understand that the entire basis for the profitability of the banking industry is the value to the bank of the temporary use of other people's money. Much more important for present purposes is the recognition that under the commercial arrangement between the escrow companies, the banks, and the escrow companies' customers as it existed before IOLTA, the value of that use was split between the banks and the escrow companies. The customers had no property interest in that value, and, although the escrow companies could choose to pass on the lower overhead resulting from their lower banking costs to their customers, that pricing decision did not create any property interest in the earnings credits. It is true, of course, that because of the IOLTA program the value to the bank of the temporary use of the escrow funds is less (although not zero -banks do not distribute as interest the full value of deposited money, or they would have no earnings). But that does not change the fact that the earnings credits were nothing but incentive payments to repeat customers, the escrow companies, to use one bank rather than another, and were never the property of the escrow companies' customers.
 
 
 63
 Because the earnings credits did not belong to the customers in the first place, but rather were incentives provided to the escrow companies to use as they pleased for any covered banking charges, any impact on the customers is no different than many caused by economic regulation of someone else. Any price increase to customers due to increased banking costs would be just the indirect result of a decrease over time in the escrow companies' ability to acquire a certain kind of property for themselves. Moreover, any price increase would be the direct result of a private, discretionary pricing decision in no way mandated by the government. As such, those price increases should no more count as part of a takings analysis regarding the customers' property than any other economic decision adverse to customers a retailer makes because of the economic impact on it of regulatory changes affecting one of its suppliers. Assume, for example, that changes in banking regulations meant that a supermarket would have to pay higher fees when depositing its daily sales receipts, and consequently the supermarket raised the price of milk. Neither past nor future purchasers of milk, we presume, could validly claim that the price increase was a taking of their property by the government.
 
 
 64
 Neither Brown nor Hayes can show that the cost of their individual real estate transactions increased as a result of the IOLTA rules. Therefore, we conclude that the alleged loss of the escrow and title companies' earnings credits had no economic impact on them.
 
 
 65
 (ii) Interference with Distinct
 
 Investment-Backed
 Expectations
 
 66
 "Governmental action through regulation of the use of private property does not cause a taking unless the interference is significant." Wash. Legal Found. v. Mass. Bar Found., 993 F.2d at 976 (citing Andrus, 444 U.S. at 66-67). Under Washington State's IOLTA rules, by definition, Appellants Hayes's and Brown's funds would not have been placed in an IOLTA account if they were capable of generating a net interest either on their own or in a "pooled interest-bearing trust account with subaccounting that will provide for computation of interest earned by each client's funds and the payment thereof to the respective party." Wash. Admission to Practice R. 12.1(c)(2). Brown recognized that fact when he testified that "[w]ithout IOLTA in place I may not have earned anything." Furthermore, because escrow and land title companies, as a general practice, never placed client trust funds in interest-bearing NOW accounts, neither Brown nor Hayes could have expected their funds to have earned interest while in the hands of their respective escrow and title companies.
 
 
 67
 Due to the structure of the IOLTA program and the general practices of escrow and title companies, neither Brown nor Hayes could have expected his principal to earn a net interest, and thus, the IOLTA program could not have interfered with their investment-backed expectations.
 
 
 68
 (iii) Character of Government Action
 
 
 69
 Brown and Hayes concede that they would have no interest without IOLTA, but they argue that, once interest is created, they have the right to determine what -if anything-is done with the interest. Viewing the accrued interest as its own entity, divorced from the principal, for the purpose of characterizing the extent of the "property" taken, Brown and Hayes assert that because the IOLTA rules dictate that all the interest earned on IOLTA accounts must go to the Legal Foundation of Washington, the IOLTA program is the equivalent of a 100 percent physical invasion of their property. We disagree.
 
 
 70
 The IOLTA rules are better viewed as a regulation of the uses of Brown's and Hayes's property, consisting of the principal and the accrued interest in aggregation. That said, the character of the government action is best viewed in the context of the industry it regulates. Banking is a heavily regulated industry, and the ability of particular types of deposits to earn interest has often been the subject of banking regulations. In fact, without the Federal Government's regulations regarding what types of accounts can earn interest, the IOLTA program may never have been born. Moreover, the ability to practice a profession -and the conduct expected of those who do-is also heavily regulated. Lawyers have always been held to the highest legal and ethical standards. As part of their state bar membership, lawyers in Washington are encouraged to provide legal services "to persons of limited means or to public service or charitable groups. " Wash. Rules of Prof'l Conduct R. 6.1. With or without IOLTA, they are required to segregate their clients' funds from their own to ensure that funds are not used improperly. Wash. Rules of Prof'l Conduct R. 1.14. When LPOs are admitted to perform a limited practice of law, they are held to the same legal and ethical standards as lawyers. Thus, they, too, are expected to safeguard their clients' property and to do their best to ensure that the legal system is available to all who need it. Viewed in this context, the IOLTA regulations are not out of character for either the commercial industry or the professions they affect.
 
 
 71
 The Takings Clause does not prevent the Government from being able to regulate how people use their property but limits that ability to what is "just and fair. " Andrus, 444 U.S. at 66-67. Although "[t]he government may impose regulations to adjust rights and economic interests among people for the public good," it may "not force `some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " Wash. Legal Found. v. Mass. Bar Found., 993 F.2d at 974 (citation omitted). Here, neither Brown nor Hayes is being singled out to bear a burden that should be borne by the public as a whole. They, as participants in our legal system, are required to place their money in IOLTA trust accounts that generate funds at no cost to them and that expand access to the legal system from which they benefit. Given the highly regulated nature of the banking and professional industries the IOLTA rules affect, this additional unobtrusive regulation does not exceed what is "just and fair" -especially where Brown and Hayes would have earned no interest absent IOLTA. We therefore conclude that Washington State's IOLTA program does not take either Brown's or Hayes's property.
 
 2. Just Compensation
 
 72
 There is a second reason why Washington State's IOLTA program does not work a constitutional violation with regard to Brown's and Hayes's property: Even if their property was taken, the Fifth Amendment only protects against a taking without just compensation. Because of the way the IOLTA program operates, the compensation due Brown and Hayes for any taking of their property would be nil. There was therefore no constitutional violation when they were not compensated.
 
 
 73
 Determining what constitutes "just compensation " requires putting "the owner of the condemned property `in as good a position pecuniarily as if the property had not been taken.' " United States v. 564.54 Acres of Land, 441 U.S. 506, 510 (1979) (quoting Olson v. United States, 292 U.S. 246, 255 (1934)). Incidental losses that result from the takings are not compensable. Winn v. United States, 272 F.2d 282, 286 (9th Cir. 1959) (rejecting claim that compensation for the loss of business resulting from highway construction should be included in compensation accounting for value of the lost land itself). "[T]he question is, What has the owner lost? not, What has the taker gained?" Boston Chamber of Commerce v. City of Boston, 217 U.S. 189, 195 (1910). Thus, we must determine what Brown and Hayes would have enjoyed in the absence of IOLTA.
 
 
 74
 Land Title Company deposited Brown's money--$90,521.29 -into an IOLTA account at Skagit State Bank where it remained for two days. The escrow IOLTA account was earning 1 percent per annuum. Hayes's $14,793.32 was deposited in Fidelity's IOLTA account; $2,000 remained in the IOLTA account for sixteen days and $12,793.32 remained in the account for two days. It is unclear from the record what the interest rate was at Hayes's bank. As previously discussed, however, without IOLTA, neither Brown nor Hayes would have earned interest on his principal because by regulatory definition, their funds would have not otherwise been placed in an IOLTA account, and the general practice of escrow and title companies was-and still is-to place funds in noninterest-bearing accounts when IOLTA does not apply. Although without IOLTA, Brown and Hayes at most would have had the right to keep their principal from earning interest, the loss of that right has no economic value.
 
 
 75
 In seeking compensation for the interest their principal earned when deposited in the IOLTA account, Brown and Hayes are in actuality seeking compensation for the value added to their property by Washington's IOLTA program. In other words, Brown and Hayes are seeking compensation not for the value of what they lost, but for the value of what the Legal Foundation of Washington has created. Our Takings Clause jurisprudence has never "force[d] a State to confer, upon the owner of property that cannot produce anything of value for him, ownership of the fruits of that property should that property be rendered fertile through the government's lawful intervention." Phillips, 524 U.S. at 181 (Breyer J., dissenting).
 
 
 76
 In the context of real property, it is clear that the owner of condemned land need not be compensated for the value created by the government's exercise of the power of eminent domain. In United States v. Virginia Electric and Power Co., 365 U.S. 624 (1961) ("VEPCO"), for example, the Court had to determine what compensation was due to the owner of a destroyed perpetual and exclusive flowage easement when the Government, exercising its dominant servitude, "reduce[d] the value of riparian lands by denying the riparian owner access to the stream." Id. at 629. Without the overriding dominant servitude, "the Government's destruction of that easement would ordinarily constitute a taking of property within the meaning of the Fifth Amendment." VEPCO, 365 U.S. at 627. Guided by the principle that the property interest owner "is entitled to be put in as good a position pecuniarily as if his property had not been taken" but not more, id. at 633 (citation omitted), the Court excluded from consideration any value derived from the land's riparian location and the water power development. Id. at 629. Because the Government's dominant servitude allowed it to reduce the value of the riparian lands by denying the riparian owner access to the water, "it also permit[ted] the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated." Id. Thus, excluding land's riparian-based value, the Court determined that just compensation for "the value of the easement is the nonriparian value of the servient land discounted by the improbability of the easement's exercise." Id. at 635.
 
 
 77
 It is also clear that a property owner need not be compensated for losing the ability to use his land when there is no "reasonable probability" that such a use will occur. United States ex rel. Tenn. Valley Auth. v. Powelson, 319 U.S. 266, 275 (1943). Thus, when the owner of a condemned parcel of land has been granted the power to take, by eminent domain, riparian lands and water rights to set up a system of hydroelectric power production but has not yet used it, the Government need not compensate him for the lost opportunity. Id. at 285. Although the value of the condemned property may "reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted," id. at 275, it need not reflect "the existence of [a] privilege to use the power of eminent domain" to create a profitable four-dam enterprise in the distant future. Id. at 280. And although the owner of the property was losing a valuable opportunity, "he [wa]s not being deprived of values which result from his expenditures or activities." Id.
 
 
 78
 Furthermore, the Government need not compensate "for any part of what it has added to the land." City of New York v. Sage, 239 U.S. 57, 61 (1915). Thus, the owner of land condemned for a reservoir is not entitled to compensation for the value added to the land by the availability and adaptability of the reservoir; it need only compensate the owner of the land for what is fairly believed to be the fair market value of the land at the time of condemnation. Sage, 239 U.S. at 61. "The Government cannot . . . `be made to pay for a loss of theoretical creation, suffered by no one in fact,' for there is `no justice in (requiring the Government to pay) for a loss suffered by no one in fact.'" VEPCO, 365 U.S. at 642 (Whittaker, J. dissenting) (citations omitted).
 
 
 79
 Here, Brown and Hayes admit that, at most, IOLTA takes their right to let their principal lie fallow. In other words, they have lost the opportunity to place the principal in a noninterest-bearing checking account. Once Brown and Hayes gave dominion and control to their respective title and escrow companies, however, their `right' to control how the principal was used had the same value to them as the barren flowage easement would have had in VEPCO, i.e., no value at all. They have produced no evidence that, without IOLTA, they could have dictated how the escrow and title companies handled their principal. Nor have they been deprived of values resulting from their expenditures or activities because, within the restrictions of the IOLTA rules, no such values could exist. Furthermore, while Brown and Hayes have the right to control the accrued interest in theory, as a practical matter, that right will never come to fruition on its own because without IOLTA there is no interest. Thus, although Brown and Hayes may have, at most, lost one of the sticks in their bundle of property rights-the right to let the principal lie fallow --"[t]here are numerous business losses which result from condemnation of properties but which are not compensable under the Fifth Amendment." United States ex rel Tenn. Valley Auth., 319 U.S. at 281. This is one of them.
 
 
 80
 We therefore hold that even if the IOLTA program constituted a taking of Brown's and Hayes's private property, there would be no Fifth Amendment violation because the value of their just compensation is nil.
 
 VI. First Amendment
 
 81
 The district court did not address Appellants' First Amendment claims because it concluded that Appellants did not have a property right to the interest at issue. Because this conclusion was abrogated by Phillips, the district court must now consider what speech, if any, is at issue and whether the IOLTA program violates any rights Appellants may have emanating from the First Amendment. Therefore, we vacate this judgment and remand Appellants' First Amendment claims to the district court for further proceedings consistent with this opinion.
 
 VII. Conclusion
 
 82
 For the foregoing reasons, the district court's grant of summary judgment with respect to Appellants' Fifth Amendment claims is affirmed, and its grant of summary judgment with respect to Appellants' First Amendment claims is vacated and remanded. Each party shall bear its own costs of appeal.
 
 
 83
 AFFIRMED in part, VACATED in part, and REMANDED.
 
 
 84
 KOZINSKI, Circuit Judge, with whom Judges Trott, Kleinfeld and Silverman join, dissenting.
 
 
 85
 For the second time within a year, our court follows the dissenters in a Supreme Court takings case while ignoring the Supreme Court majority. See also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Rental Planning Auth., 228 F.3d 998 (9th Cir. 2000) (Kozinski, J., dissenting from denial of rehearing en banc). In so doing, our court once again deprecates one of the cherished protections of the Bill of Rights--the right not to have the government take private property without just compensation. It also creates a square conflict with the only other circuit to have ruled on this issue. See Wash. Legal Found. v. Tex. Equal Access to Justice Found., 270 F.3d 180 (5th Cir.2001).
 
 
 86
 The majority starts--as it must--with the proposition that interest earned by appellants on funds deposited in IOLTA accounts is their property. The reason they must is that the Supreme Court said so. See Phillips v. Wash. Legal Found., 524 U.S. 156 (1998). The question presented, then, is whether the government must pay compensation when it takes this private property for a public purpose. The majority starts down the wrong track by asserting, as if it were an established fact, that there are some kinds of private property the government may take without paying compensation: "An allegation that private property for which no compensation is due has been taken is insufficient to sustain a Fifth Amendment claim because it is the taking without just compensation that is constitutionally prohibited." Maj. Op. at 852 (emphasis added). But, before today, no case has ever held that there are some kinds of "private property for which no compensation is due." The cases the majority cites stand for a much different proposition: They hold that the Fifth Amendment does not prohibit the taking of property, as it clearly does not; what it prohibits is the taking of property without compensation . This does not support the majority's claim that there are certain kinds of property the government may take without paying compensation.
 
 
 87
 The only case authority that arguably supports the majority's radical proposition is Justice Breyer's dissent in Phillips. The majority's theory, evidently built upon Justice Breyer's approach, seems to be that if the property owner would not have realized the value of the property but for the government's actions, then the government can take it and pay the owner nothing. Compare Maj. Op. at 857-58 with Phillips, 524 U.S. at 182 (Breyer, J., dissenting). Although Justice Breyer was in distinguished company in Phillips, his opinion lacked one important ingredient: a fifth vote. By contrast, the majority in Phillips made it quite clear that economic value is not the only interest protected by the just compensation clause: "While the interest income at issue here may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property." Phillips, 524 U.S. at 170. Phillips speaks directly to our case when it states: "The government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected." Id.
 
 
 88
 The majority also builds on Phillips's other dissent, that of Justice Souter. From there, the majority derives the novel theory that a governmental appropriation of private property can be judged by the ad hoc analysis of Penn Central Transportation Co. v. New York City, 438 U.S. 104 (1978), rather than the categorical approach of Loretto v. Teleprompter Manhattan CATV Corporation, 458 U.S. 419 (1982) and United States v. Causby, 328 U.S. 256 (1946). Compare Maj. Op. at 854 with Phillips, 524 U.S. at 176 (Souter, J., dissenting). But, contrary to the majority's assertion, it is not true that a court is free to choose whether it prefers the ad hoc approach or the per se approach in taking cases. Rather, the two approaches reflect different solutions to different problems.
 
 
 89
 Penn Central's ad hoc approach deals with regulatory takings--a difficult and vexing corner of takings law. This involves the situation where the government does not take property outright but, rather, limits the owner's use of the property for a regulatory purpose. Normally, the consequences of regulation are not compensable, because we must each bear the burdens--just as we enjoy the benefits--of living in a regulated society. For example, when the city requires a setback for buildings on residential lots, this is not a compensable taking because the regulation serves aesthetic and community purposes, and each property owner gets a correlative benefit from the fact that other homeowners can't build within the setback portion of their own lots. However, when a regulation goes "too far" in limiting the owner's use of the property, compensation is due. See Dolan v. City of Tigard, 512 U.S. 687 (1994); Nollan v. Calif. Coastal Comm'n, 483 U.S. 825 (1987). The way we determine whether a regulation goes "too far," and thus becomes a taking, is by applying the ad hoc weighing of Penn Central.
 
 
 90
 The ad hoc approach has never been applied to a case where the government actually takes and uses the property in question. Thus, to continue with the same example, it would be totally unthinkable--at least it was until today's opinion--that a court would apply an ad hoc analysis if the city were to seize 15 feet from every homeowner's setback for the purpose of widening the street. That would doubtless be treated as a compensable taking, even if the city could prove that the homeowners would derive great benefits from the widened street. Because the city has taken the 15 feet and used it for a public purpose, there is nothing to weigh and balance; the ad hoc approach is inapplicable.
 
 
 91
 The majority's blurring of the distinction between regulatory takings and physical takings is alarming. In a complex world, a property owner will always get some benefit, real or theoretical, from a taking of his property. Thus, even the family that gets booted from its home to make room for a freeway will get the benefit of a much faster commute from the park bench whence it must take up residence. Under an ad hoc approach, this would merely be an adjustment of the burdens of life in the big city. But the Supreme Court--in majority opinions--has held that the physical taking of any property by the government or its agents is a compensable taking, even if the property owner gets an offsetting--or even a net--benefit. See Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982). The majority in Phillips, in fact, relies on Loretto and not on Penn Central.
 
 
 92
 My colleagues try to avoid the clear teaching of Phillips by arguing that the per se approach of Loretto and similar cases applies primarily to takings of real property. Maj. Op. at 854. Of course, this is not true; if the city wants to display your Renoir in its museum, it can't just take it and compensate you with the joy of viewing it during visiting hours. The majority seems to admit as much when it quickly adds "personal property" to the description of property covered by the per se approach. Id. (quoting United States v. Sperry Corp., 493 U.S. 52, 62 n.9 (1989)). However, the majority finds it "particularly inappropriate" to apply a per se analysis when the property in question is money. But money is property and the majority gives no logical explanation for treating it differently. The majority argues that money is different because it is fungible. See Maj. Op. at 854-55. But this makes no sense at all. If the government comes into your house and takes that Renoir off your wall, you will suffer a compensable loss. You suffer the same loss if the government comes into your house and seizes an equal value in cash--the two events are indistinguishable for purposes of takings analysis. It is true that you might rue the taking of the Renoir more--you may have grown attached to it, or it may have sentimental value because you inherited it from Aunt Bertha who made you promise to keep it in the family. No matter, the government is entitled to take it, so long as it pays you the market value; you are entitled to nothing on account of your wounded feelings. See United States v. Miller, 317 U.S. 369, 375 (1943).
 
 
 93
 For purposes of the takings clause, then, real and personal property are reduced to their cash equivalents. It thus strikes me as peculiar and quite dangerous to say that the government has greater latitude when it takes money than when it takes other kinds of property. This portion of the majority's opinion will doubtless be greeted with a rousing cheer by government officials who will eagerly look to bank accounts and other places where money is kept, with an eye to snatching a few dollars here and there, and justifying it with some sort of "ad hoc" analysis.
 
 
 94
 The majority's reliance on a stray footnote in Sperry--discussing a very different proposition--does not survive scrutiny. As the Supreme Court explained in Phillips, Sperry dealt with a fee charged by the government for a service it rendered. The Court recognized that, where the government is entitled to be reimbursed for expenses it has incurred on the property owner's behalf, the charge is not a taking. In that context, the discussion of fungibility makes sense: If the government may charge a fee, it makes no difference whether it takes the money directly from the owner's funds or, instead, requires the owner to pay it separately. Sperry , 493 U.S. at 62 n.9. Nowhere--and certainly not in Sperry--does the Supreme Court suggest that the government's obligation to pay compensation is eliminated because it takes money rather than real or personal property. Indeed, Phillips makes it very clear that Sperry does not apply to this situation, because this is not a case where the government is charging for a service it renders. See Phillips, 524 U.S. at 171. My colleagues again disregard the teachings of the Phillips majority.
 
 
 95
 It is no doubt true that the IOLTA program serves a salutary purpose, one worthy of our support. As a citizen and former member of the bar, I applaud the state's effort to provide legal services for the poor and disadvantaged. But there is absolutely no reason appellants should have to give up their property to cover the full cost of this shared social responsibility. If the state believes that this is a service it should provide, it must be willing to pay for it. There ain't no such thing as a free lunch.
 
 
 96
 * * *
 
 
 97
 The case should be analyzed and decided precisely as in Judge Kleinfeld's opinion for the three-judge panel. Because I believe Judge Kleinfeld there sets out the proper analysis, and does so elegantly and persuasively, I adopt it in full as part of my dissent. For ease of reference, I reproduce Judge Kleinfeld's opinion as an appendix hereto.
 
 APPENDIX
 
 98
 KLEINFELD, Circuit Judge.
 
 
 99
 This case raises constitutional questions about Washington's program for applying interest on lawyers' (and others') trust accounts to various good works.
 
 I. FACTS
 
 100
 Lawyers' ethical requirements have long required that "[m]oney of the client or collected for the client . . . should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."[1] The contemporary formulation is that a "lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained in the state where the lawyer's office is situated, or elsewhere with the consent of the client or third person."[2]
 
 
 101
 In order to keep clients' money separated, a lawyer traditionally maintains a trust account separate from the law firm account, and keeps clients' money in the trust account. Clients advance money to lawyers for many reasons, such as for the closing of a business or real estate transaction, satisfaction of a claim, bail, and fees to be earned by the lawyer in the future but to be secured by the trust account deposit. Lawyers also receive money to be paid partly or entirely to their clients, perhaps after deduction of fees. Often insurance companies send settlement checks to plaintiffs' lawyers payable to the client "and" the lawyer. The lawyer has the client endorse the check for deposit in the trust account by the lawyer and subsequent disbursement after the check clears, to third parties with claims, to the lawyer for his fees, and to the client. Traditionally, a law firm maintained one trust account in a non-interest bearing checking account for all its clients. Occasionally a separate interest bearing trust account or other device was used for a single client's money when the amount is large enough or the duration long enough to be worth maintaining a separate account.
 
 
 102
 Earlier in the century, lawyers often used to keep clients' money in separate envelopes in office safes.[3] After World War II (perhaps partly because banks had become safer), lawyers started placing funds in bank accounts separate from their law firm accounts.[4] Neither device generated any interest for the client or the lawyer, and the lawyer had to pay fees to the bank to maintain the trust account. Though the lawyer held the client's money as a fiduciary,[5] failure to obtain interest for the client was generally not a breach of fiduciary duty because none was obtainable as a practical matter. Interest was not paid on money in checking accounts, but except where the size and duration of the deposit were both large, no one concerned themselves about it. For a client to obtain interest on an amount held in trust, the expected interest had to exceed the value of the lawyer's time needed to establish a separate account, or else seeking interest made no economic sense. For the occasional circumstance where it was worth the time, lawyers would establish a separate interest bearing trust account so that the client could get the interest.[6]
 
 
 103
 Two things precipitated a change from the tradition that no interest was obtained from lawyers' trust accounts. First, in the 1970's, interest rates reached unprecedented high levels. Suppose $30,000 from a routine personal injury settlement were left in a non-interest bearing trust account for two weeks, while the insurer's check cleared and court reporters' and other expenses were paid. When rates were only 3%, only $35 in interest was lost, an amount less than the lawyers' fees and bank charges that would be required to maintain a separate account to obtain the interest. But when money market funds were paying 19%, a client stood to lose $219 on the same deposit. The interest was just too much to ignore.
 
 
 104
 Previously, banks were receiving the benefit of the use of the money in lawyers' non-interest bearing trust accounts, effectively as free loans from lawyers' clients, because before 1980, federal law prohibited federally insured banks and savings and loans from paying interest on checking accounts.[7] The competitive pressure on banks from money market funds and others led to the second change, a new federal statute allowing payment of interest on some demand accounts.
 
 
 105
 The combination of statutory and regulatory changes allowing payment of interest on some demand bank accounts and high interest rates led to programs in all the states[8] where lawyers' trust accounts generated interest applied by nonprofit foundations under bar or court supervision to charities, such as provision of free legal services for poor people. This case involves Washington's IOLTA ("interest on lawyers' trust accounts") program.
 
 
 106
 The Washington Supreme Court created an IOLTA program in 1984 and codified it in the Washington Rules of Professional Conduct.[9] Lawyers are required, on pain of professional discipline, to hold small and short term moneys in interest bearing trust accounts, with the interest going to the Legal Foundation of Washington.[10] The Legal Foundation is a charitable organization established by the Supreme Court of Washington. Clients' funds in lawyers' trust accounts generate interest that the banks pay to the Legal Foundation of Washington. Clients' knowledge or consent is not required. Clients are only entitled to the interest on their money, under the Washington IOLTA rules, if the interest earned would be greater than the bank fees and fees for lawyers' and accountants' time to establish a separate interest bearing account for the client or maintain sub-accounts in a pooled trust fund. The money held in trust for a length of time too short or in amounts too small to generate interest exceeding these fees and bank charges generates interest for the Washington Legal Foundation.[11]
 
 
 107
 This case has the unusual twist (factually unusual, but it makes no difference analytically) that the IOLTA rules apply to some people who are not lawyers, and the non-lawyers are the plaintiffs. Some duties traditionally performed by lawyers are also performed in some localities by non-lawyers, frequently raising questions among the state bars and supreme courts about whether those services constitute the unauthorized practice of law. The issue of non-lawyers preparing documents for real estate transactions has been resolved by the Washington Supreme Court. In its rules for the bar, the Court has provided for "limited practice of law" by "closing officers," who are not lawyers but may nonetheless prepare these documents.[12] Closing officers, like lawyers, take money into trust, typically as escrow agents taking into trust the seller's signed documents and the buyer's money and exchanging them. The Washington Supreme Court bar rules require that where a limited practice closing officer prepares the papers, the money must be placed into the same IOLTA accounts as lawyers' trust funds.[13]
 
 
 108
 The title and escrow companies that employ closing officers do not have the same historical traditions as the bar. Traditionally, lawyers never received anything of value from the banks they used for trust accounts, and had to pay the bank fees for the trust accounts out of their law firm accounts, that is, the lawyers' own money. The escrow companies in Washington, like the lawyers, have in the past deposited money held in trust for customers in non-interest bearing trust accounts. Unlike the lawyers, the escrow companies have in the past received something of value in return from the banks. The banks did not pay them cash, but rather gave them credits applicable against bank fees. The credits were applied to such items as bank charges for money transfers, account reconciliations, and returned checks. Some escrow companies now charge their customers what they call "IOLTA fees " on the theory that IOLTA costs them money because they have lost these bank credits.
 
 
 109
 The small amounts of interest from each transaction in lawyers' and escrow companies' trust accounts add up to a lot of money, even though interest rates are not nearly as high as they were twenty years ago. In 1990 the program yielded $3.9 million for the Legal Foundation of Washington, in 1995, $2.7 million.
 
 
 110
 Appellants have varying concrete interests in the IOLTA program. Mr. Brown regularly buys and sells real estate in the course of his business, has engaged in at least one transaction where he knows interest on his $90,521.29 advance went to the Legal Foundation of Washington through the IOLTA program, and declares "I object to anyone other than me taking the interest earned on my funds." Mr. Hayes declares likewise, and also objects "to some of the activities engaged in" by the Legal Foundation and those to whom it distributes IOLTA money. Mr. Daugs owns an escrow company and is a limited practice officer. According to his declaration, he has been violating the IOLTA rule so that his customers can have the benefit of earnings credits offsetting bank charges and because he objects to some activities of the Legal Foundation and its grantees. Ms. Maxwell is a former licensed limited practice officer employed by a title company that provides escrow services. Her company decided to fire all the limited practice officers to avoid the IOLTA rule and keep the bank credits, so she had to surrender her license and quit using some of her valuable skills in order to keep her job.
 
 
 111
 As an example of the activities some plaintiffs object to, they submitted a letter from the Legal Foundation to a legal services program saying "[h]ave I got a deal for you . . . . This means you can do work without regard to [Legal Services Corporation] restrictions for the first three quarters." The Legal Services Corporation, a federally funded national legal services program, provides funding for programs in the states, but legal restrictions prevent legal services staff attorneys from engaging in certain activities. The IOLTA money from Washington Legal Foundation is not encumbered by these restrictions. Thus the named plaintiffs object not only to losing the interest that IOLTA receives, and losing the free bank services they formerly received, but also to how the Legal Foundation uses the interest it obtains on their trust funds.
 
 
 112
 The named appellants and Washington Legal Foundation, a public interest advocacy group, sued the Legal Foundation of Washington and the Washington Supreme Court. They sought a declaratory judgment that the rules requiring limited practice officers to place clients' funds into IOLTA trust accounts, Washington Admission to Practice Rules 12(h) and 12.1, violated their First and Fifth Amendment rights. They also sought an injunction against disciplinary action for violating the rules and a refund of whatever interest IOLTA received from their deposits. On cross motions for summary judgment, the defendants prevailed in district court.
 
 II. ANALYSIS
 
 113
 Plaintiffs argue that the interest on their trust accounts belongs to the clients, and that the IOLTA program violates their Fifth Amendment right to the interest by taking it without just compensation. Plaintiffs further argue that the program violates their First Amendment right by forcing them to finance speech to which they object. We do not reach the First Amendment questions, because we conclude that plaintiffs are entitled to relief on their Fifth Amendment claim.
 
 
 114
 A. Ripeness.
 
 
 115
 Defendants argue that the Fifth Amendment claim is not ripe under Williamson County Reg'l Planning Comm'n v. Hamilton Bank.[14] In Williamson, a landowner sued in federal court for just compensation, claiming that county land use regulations were so onerous as to amount to a taking.[15] The Court held that the claim was not ripe for federal adjudication, because the landowner had not yet obtained a final decision from the county nor had it used the available state procedure for obtaining just compensation.[16] Under Williamson, ripeness of a claim for compensation for a taking requires that (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue," and (2) the claimant has sought "compensation through the procedures the State has provided for doing so."[17] Defendants' theory is that plaintiffs have not met these requirements, and must sue for inverse condemnation in state court under Washington law before their Fifth Amendment claim can be ripe for federal adjudication. Defendants did not dispute ripeness in district court, but we consider it lest we overstep our jurisdiction.[18]
 
 
 116
 Unlike Williamson, there is no ongoing regulatory proceeding, so there is no occasion, as there was in Williamson, to await a final decision. There, the county zoning process was not yet complete. Here, what is at issue are general rules, Washington Rules of Professional Conduct Rule 1.14 and Washington Admission to Practice Rule 12, not an individualized regulatory proceeding. The process of promulgating the final rule has long since been concluded. Thus the"finality" requirement of Williamson does not preclude ripeness.
 
 
 117
 Most of what is at issue in this case is declaratory and injunctive relief, not the takings claim for $20 or so of lost interest. That $20 tail cannot wag the dog of this constitutional challenge to the IOLTA program into state court. Williamson generally keeps claims for just compensation in state court, but it does not exclude from federal court a claim for declaratory and injunctive relief to establish that a state law, on its face, violates the Fifth Amendment.[19]
 
 
 118
 Also, Williamson does not apply where "the inverse condemnation procedure is unavailable or inadequate."[20] Where resort to state remedies would be futile,[21] as when the state has no "adequate provision for obtaining compensation at the time of the taking,"[22] the second Williamson requirement does not apply. Futility is plain here. There cannot be a remedy under state law, because it is state law, and not merely an action by particular officials, that is being challenged. Were there any doubt about how the Supreme Court of Washington would respond were a challenge to be brought, the doubt is eliminated because the Court has already spoken in this case. The justices of that court are among the defendants, and they have filed a brief as appellees. The justices of the Supreme Court of Washington do not argue that the case is unripe, nor do they argue on any ground that they ought to have the opportunity to rule on this case before the federal courts do, nor do they suggest that any state remedy might be available. The justices argue that the IOLTA rule does not violate the Fifth Amendment. The IOLTA rule at issue, and the brief, filed in the justices' capacity as such, leave no doubt that "the state has explicitly rejected its theory of the case."[23]
 
 
 119
 B. Property right.
 
 
 120
 Defendants argue that the clients whose money is deposited into an IOLTA account do not own a property right in the interest that money earns, so the Fifth Amendment protection of property does not pertain. The Fifth Amendment protects property rights but does not create them.[24] Under Washington law, they argue, the common law rule, "interest follows principal," does not necessarily apply, so the owner of principal in a trust account does not necessarily own the interest it generates. The Washington Supreme Court expressly considered and rejected objections to its IOLTA program on Fifth Amendment grounds, and stated in response to the objections that "interest on short-term or nominal client funds . . . does not constitute `property' as defined by the United States or Washington Constitutions."[25]
 
 
 121
 One of the amicus briefs argues that "clients lose nothing because of IOLTA," because were it not for the pooling, the clients could get no interest, because the costs of administering the accounts to produce it would exceed the amounts produced. Indeed, the IOLTA rule is written so that if the interest would exceed the administrative costs of obtaining and crediting it, then the money should not be deposited into the IOLTA trust account.
 
 
 122
 This is more a practical than a legal argument insofar as it addresses who owns the interest. The claim is not that the trust accounts do not produce interest, but only that the administrative expense of sharing it among the clients would exceed the amount earned. The money deposited into the trust account is the clients' money. If the clients own the interest, it might be worth it to them to pay the expense and collect it even if the lawyers or escrow companies did not think it worth the bother. One of the affidavits in this case establishes that a client might well say (and the affiant more or less does), "it is not so much that I want the $20, though I do, as that I don't want the Legal Foundation's donees to get it, because I don't like what they do with it." If lawyers and escrow companies had to pay trust account interest to clients, then software programs might be developed to make it easy to do it. If pooling works to generate interest for IOLTA, then it could presumably be made to work to generate interest for clients. Also, as the affidavits in this case demonstrate, the clients can and do suffer a detriment if the interest is given to the Legal Foundation, because the escrow companies impose charges on the clients to compensate themselves for the bank credits they formerly obtained. The property question is whether the clients own the interest, not whether the amounts are so small it is not worth the clients' while to collect it.
 
 
 123
 The circuits had been split on this question,[26] and were when the district court ruled. Subsequent to that ruling, the Supreme Court definitively answered the question, in Phillips v. Washington Legal Foundation:[27] the clients own the interest.
 
 
 124
 Phillips was a Fifth Amendment challenge to the Texas IOLTA program. It is materially similar to the Washington IOLTA program at issue here. Similar language was used in Texas to limit the pooled IOLTA trust funds to short term and nominal amounts that would not generate interest for clients exceeding the administrative costs of paying it to the clients. The question the Court considered was "whether interest earned on client funds held in IOLTA accounts is`private property' of either the client or the attorney for purposes of the Takings Clause of the Fifth Amendment."[28] The Court answered by saying, "[we] hold that it is the property of the client."[29]
 
 
 125
 Defendants argue that Phillips should be distinguished because it depends on Texas law, and Washington law differs. The distinction is unpersuasive, for several reasons. Basically, Phillips is not based on some odd quirk of Texas law, but on a fundamental and pervasive common law principle accepted by both states. The central question in this case was open and subject to serious arguments on both sides before Phillips, but not after.
 
 
 126
 Phillips begins with the proposition that the principal in the trust accounts belongs to the client. Though one the defendants' briefs argues otherwise, on the ground that a bank is merely a debtor of the depositor whose duties depend on contract, that proposition is irrelevant. The relationship at issue is not between the bank and the lawyer or escrow company, but between either of them and the client. The Washington IOLTA rules, like the Texas rules, refer to the money at issue as "client funds," and "funds of clients " and "his or her funds," as distinguished from "funds belonging to the lawyer."[30] The only reason that the moneys at issue go into trust accounts instead of the firm accounts of the lawyers and escrow companies is that the money belongs to the clients, not the lawyers or escrow companies.[31]
 
 
 127
 Next, Phillips takes note of the well established rule that "interest follows principal" "as the shadow the body."[32]
 
 
 128
 The rule that "interest follows principal" has been established under English common law since at least the mid-1700's. Beckford v. Tobin, 1 Ves.Sen. 308, 310, 27 Eng.Rep. 1049, 1051 (Ch. 1749) ("[I]nterest shall follow the principal, as the shadow the body"). Not surprisingly, this rule has become firmly embedded in the common law of the various States.[33]
 
 
 129
 Phillips also responds to the practical argument discussed above, that the IOLTA program takes interest only from clients who would receive none, because the amounts are too small or deposited for too short a time to generate interest in excess of administrative expense to distribute it. The Court held that the interest is property protected under the Fifth Amendment even if "it lacks a positive economic or market value."[34] "While the interest income . . . may have no economically realizable value to its owner, possession, control, and disposition are nonetheless valuable rights that inhere in the property."[35] This holding vindicates the plaintiffs' claim in the case at bar that they do not want interest on their money going to the application to which the Legal Foundation of Washington has elected to contribute it.
 
 
 130
 Phillips goes on to establish a striking proposition: states are not free to take away the client's property right to the interest by statutes depriving them of property rights in it.[36] This holding in Phillips speaks conclusively to defendants' argument that the clients in Washington do not own the interest because the Washington IOLTA rule so established as a matter of state law, and the Washington Supreme Court so stated in the dialogue about whether to adopt the IOLTA rule. The Supreme Court in Phillips noted that in a previous decision, Webb's Fabulous Pharmacies, Inc. v. Beckwith,[37] it held that a Florida statute governing interpleaders violated the takings clause. The statute at issue in Webb's provided that where a party deposits a sum with the clerk of the court the interest on that principal "shall be deemed income of" the clerk's office or the court. Were a state able, by court rule or statute, to establish ownership of interest in one other than the owner of the principal, this statute would have vitiated the Fifth Amendment. But Webb's held that the statute, analogous to Washington's IOLTA rule, violated the Takings Clause.[38]
 
 
 131
 " `[A] state by ipse dixit, may not transform private property into public property without compensation' simply by legislatively abrogating the traditional rule that `earnings of a fund are incidents of ownership of the fund itself and are property just as the fund itself is property.' In other words, at least as to confiscatory regulations as opposed to those regulating the use of property, a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law."[39]
 
 
 132
 We applied Phillips in, Schneider v. California Department of Corrections.[40] There, prison inmates in California maintained small amounts of money in trust accounts, to purchase such personal convenience items as toothpaste at the prison canteens. A California statute provided that interest earned on inmates' money in the trust account would go to a state "inmate welfare fund" rather than to the individual inmate. Even though the state statute purported to eliminate any property interest the inmates might own to interest on their money, we held that under Phillips, "constitutionally protected property rights can--and often do--exist despite statutes . . . that appear to deny their existence."[41]
 
 
 133
 We noted in Schneider that in Phillips and Webb's, the Supreme Court had held that "a State may not sidestep the Takings Clause by disavowing traditional property interests long recognized under state law,"[42] and both cases relied on the common law rule that "interest follows principal" "in the face of a contrary state statute."[43] To explain how this could be, we explained in Schneider that "Roth stands not for a theory of plenary state control over the definition and recognition of compensable property interests,"[44] but rather that "there is, we think, a `core' notion of constitutionally protected property," and a state's power to alter it by legislation "operates as a one-way ratchet of sorts," allowing the states to create new property rights but not to encroach on traditional property rights.[45] We recognized in Schneider, as the Supreme Court did in Webb's and Phillips, that "[w]ere the rule otherwise, States could unilaterally dictate the content of--indeed altogether opt out of--both the Takings Clause and the Due Process Clause simply by statutorily recharacterizing traditional property-law concepts."[46] Thus, for example, a state could obtain vast moneys for good works until everyone with large sums of money moved it out of state, by passing a law stating that all amounts in excess of $100,000 on deposit in any financial institutions are the property of the state. Schneider holds that the "common law pedigree " since 1749 of the rule that interest follows principal, and its"near-universal endorsement by American courts," establishes that "interest income of the sort at issue here is sufficiently fundamental that States may not appropriate it without implicating the Takings Clause."[47]
 
 
 134
 Phillips' and Schneider's rejection of positive state law as a means of avoiding the Takings Clause, disposes of the proposition that there is no taking because Washington, in its IOLTA program, has established as a matter of positive law that interest does not follow principal with respect to small and short term deposits in client's trust accounts. Texas, after all, had also established its IOLTA program as law, so if property rights in interest could be destroyed by state law in that manner, Phillips had to come out the other way. A state cannot avoid the Fifth Amendment limitation on takings of property by legislating away the property right.
 
 
 135
 All that is left as a possible distinction of this case from Phillips is that Washington, unlike most common law jurisdictions, has not accepted the common law rule that interest follows principal. Exceptions to the rule will not establish a contrary view, because there were exceptions in Texas. Despite those exceptions, Phillips held that the client's ownership of the principal in the trust account still gave the client a property right in the interest. Defendants have to establish that Washington is an anomaly among common law jurisdictions, not merely by having some exceptions, but by not having accepted the virtually universal rule.
 
 
 136
 Not surprisingly, the case for Washington's anomalous status cannot be made. Most American jurisdictions adopted the common law in what are called "reception" statutes. Washington has a quite ordinary reception statute: "The common law, so far as it is not inconsistent with the Constitution and laws of the United States, or of the state of Washington nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state."[48] This ordinary reception of the common law was codified by the Territory of Washington in 1862, well before statehood, so no property owner in Washington has had to fear that by entering the state he or she was leaving behind the protection of the common law, including the rule that interest follows principal. In 1895, the Washington Supreme Court in Tacoma School District v. Hedges[49] applied the rule in holding that interest on delinquent taxes should go to the school districts entitled to the principal amount of the taxes, not to the general funds of the counties collecting the taxes. A century later, the court applied the rule similarly in City of Seattle v. King County[50] based on the"common law principle that interest on public funds follows ownership of those funds."[51] Defendants note some Washington statutory exceptions to the common law rule,[52] but they are of no more significance than the Texas exceptions that the Court in Phillips deemed insufficient to overcome the Fifth Amendment significance of the common law rule. Statutes in derogation of the common law in a few limited and specialized circumstances do not work a general abrogation of the common law outside their scope.[53]
 
 
 137
 C. Taking.
 
 
 138
 Phillips did not express a view on whether the Texas IOLTA law was a taking, nor on the amount of compensation due if it was,[54] because the circuit from which certiorari had been taken only addressed whether the interest was the client's property, and the petition for certiorari addressed only that question.[55] Defendants argue that even if interest on client trust funds is the property of the clients, the IOLTA rule works no taking. The district court did not reach the question of whether there was a taking for which compensation was due because Phillips had not yet been decided by the Supreme Court when it ruled. The district judge relied on the one circuit court case then on the books,[56] which has since been superseded by Phillips.
 
 
 139
 Plaintiffs presented evidence that for at least one of them, a measurable amount of money, about $20 in interest, was diverted to the Legal Foundation. Phillips holds that even where the client's interest on trust accounts "may have no economically realizable value to its owner, possession, control and disposition are nonetheless valuable rights that inhere in the property."[57] To apply that concretely, a real estate purchaser might want interest on his money to go to his or her preferred charity, perhaps a church, a school, Mothers Against Drunk Driving, or the local Rescue Mission, rather than the Legal Foundation's preferred charity, legal services for indigents, even if that interest could not be realized by the real estate purchaser. Plaintiffs submitted evidence that at least some of them do in fact object to their interest going to the Legal Foundation's grantees.
 
 
 140
 Defendants argue that there has been no taking because there has been no physical invasion of tangible property. They rely on the Supreme Court's statement in Penn Central Transportation Co. v. New York City[58] that "[a] taking may more readily be found when the interference with property can be characterized as a physical invasion by the government."[59] But their argument uses the statement out of its context, which was regulation of real estate to preserve a historically and architecturally important building. The statement cannot be applied in the distinguishable context of money deposited in banks or invested in securities or money market funds. This would imply the nonsensical proposition that a taking would less readily be found if a state entirely confiscated people's money from their bank accounts or IRA's than if it installed a sign on their land.
 
 
 141
 Defendants seem to be arguing that the government can confiscate people's money without it being a taking compensable under the Fifth Amendment, based on cases where the government provided a service and charged a reasonable user fee for the service.[60] Taken out of the context of users' fees, the proposition is absurd. Unlike medieval England, most assets are now held in the form of fungible intangibles such as bank accounts, money market accounts, and securities. The Fifth Amendment protection of property would be eviscerated were we to construe confiscation of fungible intangibles as not amounting to a taking, as defendants urge. The Supreme Court drew precisely this distinction, between reasonable users' fees and the interest on IOLTA accounts, in Phillips, noting that it "would be a different case" if the state were "imposing reasonable fees it incurs in generating and allocating interest income."[61] Phillips holds that United States v. Sperry Corp.,[62] the user fee case, has no application to complete "confiscation of respondents' interest income " by an IOLTA program where the funds are managed by banks and private individuals.[63]
 
 
 142
 Defendants make another, more appealing, argument from Penn Central that the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations."[64] The argument is that, because the plaintiffs could not have realized any money from the IOLTA funds, the economic impact is nonexistent, and because the IOLTA rule was in effect when they acted, the IOLTA rule could not have interfered with their expectations.
 
 
 143
 This argument fails on several independent grounds. First, the "economic impact" test is articulated in Penn Central in the context of regulation of the use of real estate, not deprivation in its entirety of any property. The point of the economic impact test in Penn Central is to distinguish government regulations of the owner's use of property permissible under its police power from those that go too far, requiring the government to compensate the owner for taking his property. That distinction is not necessary or appropriate where the government entirely appropriates a sum of money belonging to a private individual. The economic impact test would have relevance if the IOLTA rule merely regulated how the client used his interest, or where the interest was kept, or for how long. But that is not the case. The IOLTA rule entirely appropriates the interest on the client's principal in a trust account, so the distinction between regulation under the police power and a taking subject to Fifth Amendment protection is not affected by the economic impact.
 
 
 144
 This analysis is compelled by Loretto v. Teleprompter Manhattan CATV Corp.[65] There, a city required landlords to allow cable television companies to put cables on their roofs. The Court held that this permanent physical occupation of a portion of roof space was a "taking" "without regard to the public interests that it may serve,"[66] and without regard to the "minimal economic impact on the owner."[67] The Court held that the multi-factor test in Penn Central does not apply to a permanent physical occupation, as was the case for those parts of the roof on which the cables were mounted.[68] Phillips applied Loretto, in the context of IOLTA interest rather than physical invasion of real property.[69] And Phillips interpreted Loretto to mean that property was "taken" "even when infringement of that right arguably increased the market value of the property at issue."[70] Thus, says Phillips, drawing an analogy to IOLTA interest, "the government may not seize rents received by the owner of a building simply because it can prove that the costs incurred in collecting the rents exceed the amount collected."[71] The Court in Phillips also expressly rejected the argument that because federal tax and banking regulations are what enables IOLTA to generate interest, there is no property right, on the ground that "the State does nothing to create value; the value is created by respondent's funds."[72] When the government permanently appropriates all of the interest on IOLTA trust funds, that is a per se taking, as when it permanently appropriates by physical invasion of real property.[73]
 
 
 145
 Second, it is not quite correct to say that IOLTA as structured does not deprive clients of any money. The rule says that in determining whether to deposit money held in trust into the IOLTA account or an account where the client will receive the interest, a lawyer must consider "only whether the funds to be invested could be utilized to provide a positive net return to the client," based on the interest to be earned while the funds "are expected to be" deposited, and the various expenses including lawyers' fees for administering interest payable to the client.[74] This leaves two ways in which, as a practical matter, the client may lose an economically significant amount of interest. One, probably quite common, is where the funds "are expected to be" deposited for a much shorter period than they actually are. For example, disbursement to a client may be delayed because a physician who treated him in exchange for a pro tanto assignment of settlement proceeds calls to say that another bill is coming. A closing on a house may be delayed because the engineer whose report the bank needs catches the flu and finishes the report a couple of weeks late. All sorts of reasons intervene so that expected one day deposits, originally thought to produce interest less than the anticipated expense of paying it to the client, turn into deposits for a few weeks.
 
 
 146
 The second way a client may lose interest is that the costs of lawyers' and closing officers' services are overestimated. As a practical matter, the lawyers and closing officers have a substantial incentive not to be bothered with crediting clients with their interest. It is therefore in their interest to say of almost all routine trust deposits that no significant interest will accrue and to place the money into the IOLTA account. But a client, whether out of desire that he or she get every penny coming to them, a feeling of getting "nickeled and dimed," or an objection to contributing money to lawyers' and judges' favorite charity, may think it is worth having a lawyer spend $19.95 worth of time to get the client $20 in interest. Also, the amount of time and trouble involved in collecting, allocating, and distributing interest to clients depends on how often it is done. If done once, it is probably a costly nuisance. If done frequently, it may become delegable to nonprofessional staff using off the shelf software.
 
 
 147
 D. Remedies.
 
 
 148
 Defendants argue that even if the interest is the client's property, and even if the IOLTA rule effects a taking, the Fifth Amendment nevertheless affords no remedy because the "just compensation" is zero. On this point, which the district court did not reach, a remand is necessary. The Fifth Amendment does not prohibit the taking of private property for public use; it allows it.[75] What it prohibits is the taking of private property for public use "without just compensation."[76]
 
 
 149
 Defendants argue that no equitable relief is available to enjoin a taking of private property for public use, citing Ruckelshaus v Monsanto.[77] Monsanto does not preclude all equitable relief related to a taking, but it does prevent a court in most circumstances from enjoining the taking itself. Even though the Washington IOLTA rule is a taking of private property for public use from clients of lawyers and closing officers, that does not necessarily entitle or require a district court to enjoin operation of the rule. The clients are entitled to just compensation, not to prevention of the taking, just as they would be if the state were taking their real estate to build a highway. Plaintiffs' prayer for relief seeks "reimbursement" of the interest taken from them. "Reimbursement " is not a correct form of relief, because plaintiffs never had possession of the interest that was taken from them, and, as explained below, reimbursement may be an incorrect measure of "just compensation."
 
 
 150
 Monsanto does not address all the equitable relief demanded, only the taking itself. Though they cannot enjoin the government from taking their interest for public use, plaintiffs are entitled to a declaratory judgment that taking their interest for public use without paying them just compensation, under the IOLTA rule, violates the Fifth Amendment. Plaintiffs also seek an injunction prohibiting the Washington Supreme Court from taking disciplinary action against limited practice officers (the closing officers escrow companies employ) for refusing to deposit clients' money into the IOLTA account, or from conditioning their licenses on complying with IOLTA rules. We do not decide whether such an injunction would be appropriate, because the district court has not yet considered the issue, but if it would otherwise be appropriate, Monsanto would not bar an injunction. Monsanto prevents courts from enjoining takings. This equitable relief would not enjoin takings, but would instead be addressed to saving the jobs of title and escrow company employees caught between the IOLTA rules and employers who do not want to employ anyone who will comply with the IOLTA rules.
 
 
 151
 Defendants correctly argue that the measure of just compensation is not the value that the government gains, but rather the value that the person whose property was taken loses.[78] Ordinarily if money is taken, it comes to the same thing, but not necessarily in this case. The evidence before us allows for differing conclusions, so there is a genuine issue of fact on this record. It is possible that the interest gained by the defendants exceeds the amount of the loss by the clients.
 
 
 152
 Plaintiffs' submissions include what the escrow companies call "IOLTA fees" charged to customers whose money is put into the IOLTA account. These fees and the affidavits explaining them support an inference that the clients are harmed financially by the IOLTA program, but the "IOLTA fees" do not measure the loss. The IOLTA fees are not charged by IOLTA, but by the title and escrow companies. Before IOLTA the banks previously received the benefit of the "float," that is, the interest-free loans lawyers gave them of their clients' money, and escrow companies of their customers' money, when it was held in trust accounts. A bank account is a loan of money by the depositor to the bank.[79] Before IOLTA, the banks "kicked back" part of this benefit of this interest-free loan to the title and escrow companies. The customers who put the funds in escrow, and had equitable title to them, received nothing. Now that IOLTA receives the benefit of the "float" instead of the banks, the banks no longer share it with the title and escrow companies, in the form of credits against bank charges. So the title and escrow companies charge customers an amount they refer to as "IOLTA fees," not based on any fees charged by IOLTA, but rather on their loss of benefits they previously shared with the banks from interest-free deposits of their customers' money. Because the interest is property taken from the customers, not the title and escrow companies, just compensation is due to the customers, not the title and escrow companies, and is measured by the loss to the customers, not the title and escrow companies. The significance of the mislabeled "IOLTA fees" and loss of bank credits is that it shows some compensable value was there, even though the value was being retained by the title and escrow companies rather than the customers whose money they took in trust.
 
 
 153
 The Court in Phillips drew a distinction that implies the proper resolution of the just compensation measure (and with it, the constitutionally permissible form of an IOLTA program). Phillips says that the taking of interest on trust accounts "would be a different case" if the state were "imposing reasonable fees it incurs in generating and allocating interest income."[80] Phillips cites Sperry[81] in reference to this "different case" IOLTA plan. In Sperry, the government caused a fund to be generated for victims of Iranian revolutionary confiscations and charged a fee of 2% for expenses incurred in connection with the arbitration of claims and the maintenance of the fund.[82] By analogy with the Iranian confiscation fund, it may be the case that but for the efforts of the Washington Bar and Supreme Court, the banks and escrow companies would still get the benefit of the clients' and customers' money deposited into their trust accounts. For their service in "generating and allocating interest income," the Legal Foundation may be justified in "imposing reasonable fees" analogous to the fees the government charged on the Iranian confiscation fund. There have to be some expenses, for the clerical and administrative efforts in managing the flow and accounting for IOLTA funds. The IOLTA program managers have to pool the clients' moneys deposited into trust and make the arrangements with the banks, or there is no interest.
 
 
 154
 Just as a client is not entitled to the full amount that a lawyer collects for him, but only that amount less the lawyer's reasonable expenses and fees,[83] so just compensation for interest taken by IOLTA after IOLTA causes the interest fund to exist is something less than the amount of the interest. This analogy to the restitution theory applicable to lawyers' fees for producing a common fund is only partial. The principal, not the lawyers' efforts, produces the interest.[84] But there is some analogy to common fund cases, and to the Iranian confiscations fund in Sperry, because there would be no interest that could flow to the individual clients but for substantial administrative and clerical efforts to administer the IOLTA program, both to assure that lawyers' and escrow companies' trust funds went into the pooled accounts, and to distribute interest to clients out of pooled accounts.[85]
 
 
 155
 Even though when funds are deposited into IOLTA accounts, the lawyers expect them to earn less than it would cost to distribute the interest, that expectation can turn out to be incorrect, as discussed above. Several hypothetical cases illustrate the complexities of the remedies, which need further factual development on remand. Suppose $2,000 is deposited into a lawyer's trust account paying 5% and stays there for two days. It earns about $.55, probably well under the cost of a stamp and envelope, along with clerical expenses, needed to send the $.55 to the client. In that case, the client's financial loss from the taking, if a reasonable charge is made for the administrative expense, is nothing. The fair market value of a right to receive $.55 by spending perhaps $5.00 to receive it would be nothing. On the other hand, suppose, hypothetically, that the amount deposited into the trust account is $30,000, and it stays there for 6 days. The client's loss here would be about $29.59 if he does not get the interest, which may well exceed the reasonable administrative expense of paying it to him out of a common fund. It is hard to see how just compensation could be zero in this hypothetical taking, even though it would be in the $2,000 for 2 days hypothetical taking. It may be that the difference between what a pooled fund earns, and what the individual clients and escrow companies lose, adds up to enough to sustain a valuable IOLTA program while not depriving any of the clients and customers of just compensation for the takings. This is a practical question entirely undeveloped on this record. We leave it for the parties to consider during the remedial phase of this litigation.
 
 E. First Amendment Claim
 
 156
 Plaintiffs claim that the IOLTA program violates the First Amendment because it forces clients of lawyers and customers of escrow companies to contribute their interest money to groups such as legal services programs asserting public positions with which they disagree. Because plaintiffs prevail on their Fifth Amendment claim, and because the district court did not reach the First Amendment claim, we do not reach the First Amendment claim.
 
 III CONCLUSION
 
 157
 IOLTA programs spread rapidly because they were an exceedingly intelligent idea. Money that lawyers deposited in bank trust accounts always produced earnings, but before IOLTA, the clients who owned the money did not receive any of the earnings that their money produced. IOLTA extracted the earnings from the banks and gave it to charities, largely to fund legal services for the poor. That is a very worthy purpose. But as Phillips reminds us, the interest belongs to the clients. It does not belong to the banks, or the lawyers, or the escrow companies, or the state of Washington. If the clients' money is to be taken by the State of Washington for the worthy public purpose of funding legal services for indigents or anything else, then the state of Washington has to pay just compensation for the taking. That serves the purpose of imposing the costs on society as a whole for worthwhile social programs, rather than on the individuals who have the misfortune to be standing where the cost first falls.[86]
 
 
 158
 In sum, we hold that the interest generated by IOLTA pooled trust accounts is property of the clients and customers whose money is deposited into trust, and that a government appropriation of that interest for public purposes is a taking entitling them to just compensation under the Fifth Amendment. But just compensation for the takings may be less than the amount of the interest taken, or nothing, depending on the circumstances, so determining the remedy requires a remand.
 
 
 
 Notes:
 
 
 [1]
 Canons of Professional Ethics Canon 11(1908) (amended 1933).
 
 
 [2]
 Model Rules of Professional Conduct Rule 1.15(a) (1999).
 
 
 [3]
 See Clark v. State Bar, 246 P.2d 1, 4 (Cal. 1952).
 
 
 [4]
 See id. Some lawyers became troubled about amounts in trust exceeding FDIC insurance limits during the 80's when many banks failed.
 
 
 [5]
 Model Rules of Professional Conduct Rule 1.15 cmt. 1 (1999).
 
 
 [6]
 See In re Massachusetts Bar Ass'n, 478 N.E.2d 715, 716 (Mass. 1985) (reviewing history of IOLTA movement).
 
 
 [7]
 See 12 U.S.C. &#167 371a.
 
 
 [8]
 See Phillips v. Washington Legal Foundation, 524 U.S. 156, 159 n.1 (1998). Since Phillips was decided, the last adopting state, Indiana, has instituted an IOLTA program. See Indiana Professional Conduct Rule 1.15(d) (2000).
 
 
 [9]
 Washington Rules of Professional Conduct Rule 1.14 (2000).
 
 
 [10]
 See id. The rules provide:
 A lawyer who receives client funds shall maintain a pooled interest-bearing trust account for deposit of client funds that are nominal in amount or expected to be held for a short period of time. The interest accruing on this account, net of reasonable check and deposit processing charges which shall only include items deposited charge, monthly maintenance fee, per item check charge, and per deposit charge, shall be paid to The Legal Foundation of Washington, as established by the Supreme Court of Washington. All other fees and transaction costs shall be paid by the lawyer. A lawyer may, but shall not be required to, notify the client of the intended use of such funds.
 
 
 [11]
 Washington Rules of Professional Conduct Rule 1.14(2) (2000).
 
 
 [12]
 Washington Admission to Practice Rules Rule 12 (2000).
 
 
 [13]
 Washington Admission to Practice Rules Rule 12(b)-(c) (2000).
 
 
 [14]
 Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985).
 
 
 [15]
 See id. at 175.
 
 
 [16]
 See id. at 186.
 
 
 [17]
 Id. at 186, 194.
 
 
 [18]
 See Sinaloa Lake Owner's Ass'n v. City of Simi Valley, 882 F.2d 1398, 1404 (9th Cir. 1989). We need not decide whether takings clause ripeness doctrine is, as plaintiffs contend and as applied to this case, merely prudential and not jurisdictional, see Suitam v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733 (1997), because we reject defendants' ripeness argument.
 
 
 [19]
 See Suitam v. Tahoe Reg'l Planning Agency, 520 U.S. 725 n.10 (1997); Yee v. City of Escondido, 503 U.S. 519, 533-34 (1992).
 
 
 [20]
 Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 197.
 
 
 [21]
 See City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 710 (1999).
 
 
 [22]
 San Remo Hotel v. City and Council of San Francisco, 145 F.3d 1095, 1101-02 (9th Cir. 1998).
 
 
 [23]
 Levald, Inc. v. City of Palm Desert, 998 F.2d 680, 689 (9th Cir. 1993).
 
 
 [24]
 See Board of Regents v. Roth , 408 U.S. 564, 577 (1972).
 
 
 [25]
 IOLTA Adoption Order, 102 Wash. 2d 1101, 1109 (1984).
 
 
 [26]
 Compare Cone v. State Bar of Florida, 819 F.2d 1002 (11th Cir. 1987) with Washington Legal Found. v. Texas Equal Access to Justice Found., 94 F.3d 996 (5th Cir. 1996).
 
 
 [27]
 Phillips v. Washington Legal Foundation, 524 U.S. 156 (1998).
 
 
 [28]
 Id. at 160.
 
 
 [29]
 Id.
 
 
 [30]
 Washington Rules of Professional Conduct Rule 1.14 (2000).
 
 
 [31]
 Model Rules of Professional Conduct Rule 1.15 (1999).
 
 
 [32]
 Phillips v. Washington Legal Foundation, 524 U.S.156, 165 (1998).
 
 
 [33]
 Id.
 
 
 [34]
 Id. at 169.
 
 
 [35]
 Id. at 170.
 
 
 [36]
 See id. at 171.
 
 
 [37]
 See Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155 (1980).
 
 
 [38]
 See id. at 164-65.
 
 
 [39]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 167 (1998).
 
 
 [40]
 Schneider v. California Dep't of Corrections, 151 F.3d 1194 (9th Cir. 1998).
 
 
 [41]
 Id. at 1194.
 
 
 [42]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 167 (1998).
 
 
 [43]
 See id.; Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 162 (1980).
 
 
 [44]
 Schneider v. California Dep't of Corrections, 151 F.3d 1194, 1200 (9th Cir. 1998).
 
 
 [45]
 Id.
 
 
 [46]
 Schneider v. California Dep't of Corrections, 151 F.3d 1194, 1201 (9th Cir. 1998).
 
 
 [47]
 Id.
 
 
 [48]
 Wash. Rev. Code &#167 4.04.010 (2000).
 
 
 [49]
 Tacoma School District v. Hedges, 42 P. 522 (Wash. 1895).
 
 
 [50]
 City of Seattle v. King County , 762 P.2d 1152, 1153 (Wash. Ct. App. 1988).
 
 
 [51]
 Id. at 1155.
 
 
 [52]
 See Wash. Rev. Code &#167 18.85.310(5) (real estate brokers must deposit nominal deposits in trust accounts, the interest to be used for low income housing and continuing education for real estate professionals); Wash. Rev. Code &#167 36.48.090 (interest on bail goes to county expenses, not those posting the bail); Wash. Rev. Code &#167 59.18.270 (landlords receive the interest on tenants' security deposits). These three statutes were adopted, respectively, in 1995, 1963, and 1973, long after the reception of the common law rule that interest follows principal. We have no occasion, of course, to consider the constitutionality of these provisions.
 
 
 [53]
 Sutherland Stat. Const. &#167 61.01-61.06 (5th Ed.). The old maxim that statutes in derogation of the common law are strictly construed may be incorrect as prescription or description of how such statutes are actually construed. But as a description of how legislatures promulgate laws, it is correct to say that by legislating on one matter, they do not abrogate all common law inconsistent with the new statute on other matters that were not even before them at the time.
 
 
 [54]
 See Phillips v. Washington Legal Foundation, 524 U.S. 156, 172 (1998).
 
 
 [55]
 See id. at n.4.
 
 
 [56]
 See Washington Legal Foundation v. Massachusetts Bar Foundation, 993 F.2d 962 (1st Cir. 1993).
 
 
 [57]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 170 (1998).
 
 
 [58]
 Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).
 
 
 [59]
 Id. at 124.
 
 
 [60]
 See e.g., United States v. Sperry Corp., 493 U.S. 52 (1989).
 
 
 [61]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 171 (1998).
 
 
 [62]
 See also our user's fee decision in Commercial Builders of Northern California v. City of Sacramento, 941 F.2d 872 (9th Cir. 1991).
 
 
 [63]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 171 (1998).
 
 
 [64]
 Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978).
 
 
 [65]
 Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982).
 
 
 [66]
 Id. at 426.
 
 
 [67]
 Id. at 435.
 
 
 [68]
 See id. at 432.
 
 
 [69]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 169-70 (1998) (emphasis in original).
 
 
 [70]
 Id. at 170.
 
 
 [71]
 Id. at 170.
 
 
 [72]
 Id. at 171.
 
 
 [73]
 Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992).
 
 
 [74]
 Washington Rules of Professional Conduct Rule 1.14(3). The rule for closing officers, Washington Admission to Practice Rules Rule 12.1(b)(3), is analogous, except that "cost of closing officer's services" is substituted for "cost of lawyer's services."
 
 
 [75]
 First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304 (1987); Macri v. King County, 126 F.3d 1125 (9th Cir. 1997).
 
 
 [76]
 U.S. Const. amend. V.
 
 
 [77]
 Ruckelshaus v. Monsato Co., 467 U.S. 986 (1984).
 
 
 [78]
 See Williamson County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172 (1985); United States v. 564.54 Acres of Land, 441 U.S. 506 (1979); Boston Chamber of Commerce v. City of Boston, 217 U.S. 189 (1910).
 
 
 [79]
 See IT Corp. v. General Am. Life Ins. Co., 107 F.3d 1415, 1422 (9th Cir. 1997).
 
 
 [80]
 Phillips v. Washington Legal Foundation, 524 U.S. 156, 171 (1998).
 
 
 [81]
 United States v. Sperry Corp., 493 U.S. 52 (1989).
 
 
 [82]
 See id. at 57.
 
 
 [83]
 See Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 271 (9th Cir. 1989).
 
 
 [84]
 See Phillips v. Washington Legal Foundation, 524 U.S. 156, 168 (1998).
 
 
 [85]
 An additional detail not clear from the record as it stands is whether the interest could flow to clients, or only to charities selected by clients, under the restrictions applicable to financial institutions in which trust funds could prudently be pooled.
 
 
 [86]
 See Armstrong v. United States , 364 U.S. 40, 49 (1960).